THE STATE OF OHIO, APPELLEE, v. AHMED, APPELLANT.

[Cite as *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190.]

(No. 2001–0871—Submitted April 27, 2004—Decided August 25, 2004.)

ALICE ROBIE RESNICK, J.

{¶ 1} On the afternoon of September 11, 1999, Belmont County Sheriff deputies discovered the bodies of Dr. Lubaina Ahmed, Ruhie Ahmed, Nasira Ahmed, and Abdul Bhatti in Lubaina's rental home. Later that night, defendant-appellant, Nawaz Ahmed, was detained before he could depart for Pakistan on a flight from John F. Kennedy International Airport ("JFK") in New York. Appellant was indicted for the aggravated murders of his estranged wife, Lubaina, her father, Abdul, and her sister and niece, Ruhie and Nasira. Appellant was found guilty and sentenced to death.

## I. Facts and Case History

{¶ 2} In October 1998, Lubaina hired an attorney to end her marriage with appellant and to secure custody of their two children, Tariq and Ahsan. According to Lubaina's divorce attorney, appellant did not want a divorce, and consequently, it was a hostile divorce proceeding. In early February 1999, shortly after the complaint for divorce had been filed, Lubaina was awarded temporary custody of the children and exclusive use of the marital residence. Later that month, the divorce court issued a restraining order to prevent appellant from coming near Lubaina or making harassing phone calls to her.

{¶ 3} Appellant had accused Lubaina, a physician, of having an affair with another physician, and claimed that their oldest son, Tariq, was not his. A subsequent paternity test showed that claim to be false. According to Lubaina's divorce attorney, Grace Hoffman, Lubaina had been afraid of appellant, and she had called Hoffman three or four times a week, "scared [and] frustrated * * *. It just kept escalating." Lubaina had also confided to Hoffman that appellant had forced her to have sex with him during the marriage.

{¶ 4} Tahira Khan, one of Lubaina's sisters, corroborated that Lubaina had feared appellant. She also testified that Lubaina had told her that appellant had raped her repeatedly.

{¶ 5} The owner of the rental home where Lubaina resided testified that Lubaina had called him in February 1999 and asked him to change the locks on the house. He stated that Lubaina had been very upset and had asked that he change them within the hour.

{¶ 6} In March 1999, Lubaina complained to police that appellant was harassing her by telephone, but after the officer explained that the matter could be handled through criminal or civil proceedings, she decided to handle it through the ongoing divorce proceedings. The final divorce hearing was scheduled for Monday, September 13, 1999, and Lubaina had arranged for her sister Ruhie to fly in from California the Friday before to testify at the hearing.

{¶ 7} On Friday, September 10, 1999, appellant called Lubaina's office several times. But Lubaina had instructed the medical assistants at her office to reject any phone calls from him. Then, at approximately 4:00 p.m. that day, Lubaina took appellant's call. Appellant, who worked and lived in Columbus, wanted Lubaina to bring the children to him for the weekend two hours earlier than planned. Appellant claimed that he was planning a surprise birthday party for their youngest son. Lubaina, however, refused to change her plans and told appellant that he was using the birthday party as an excuse to inconvenience her.

{¶ 8} Rafi Ahmed, husband of Ruhie and father of two-year-old Nasira, testified that Ruhie and Nasira had been scheduled to arrive in Columbus from California at 10:34 p.m. on Friday, September 10. Ruhie had planned to call Rafi that night when she arrived at Lubaina's home near St. Clairsville. However, since he had not heard from Ruhie, Rafi began calling Lubaina's home at 1:21 a.m., Saturday, September 11. Rafi called 20 to 25 times, but he got only Lubaina's answering machine. At approximately 3:00 a.m., he called the Belmont County Sheriff's Office.

{¶ 9} A parking receipt found in Lubaina's van indicated that the van had entered a Columbus airport parking lot at 9:30 p.m. and exited at 11:14 p.m. on September 10, 1999.

{¶ 10} Around 3:45 a.m. on September 11, in response to Rafi Ahmed's call, a sheriff's detective went to Lubaina's home and knocked on the doors and rang the doorbell. She got no answer. The detective also looked in the windows, but nothing at the home appeared to be disturbed.

{¶ 11} Later that day, Belmont County Sheriff's Department Detective Steve Forro was assigned to investigate the missing persons. He recognized Lubaina's name because he was the officer who had talked to her regarding appellant's harassing phone calls. Forro called appellant's home to see if he had any information. Appellant did not answer, so Forro called Columbus police to have them check appellant's apartment. They did and found that he was not home.

{¶ 12} Forro went to Lubaina's home at 2:18 p.m. As he walked around the outside of the house, he noticed a flicker of a car taillight through a garage window. Using a flashlight, he looked through the window and saw a van with its hatch open and luggage inside. He then saw the body of a man on the floor covered with blood.

{¶ 13} Forro called for backup. Deputy Dan Showalter responded and entered through a side door, which he had found unlocked. He searched the house and found three more bodies on the basement floor.

{¶ 14} Detective Bart Giesey found appellant's MCI WorldCom employee badge on the basement floor near the bodies. Records from appellant's employer, MCI WorldCom in Hilliard, Ohio, revealed that appellant's badge was last used at 7:19 p.m. on September 10, 1999.

{¶ 15} Through several inquiries, police learned that appellant was scheduled to depart from JFK for Lahore, Pakistan, that evening. Earlier that day, appellant, through a travel agent, had booked a flight leaving for Pakistan that same evening. Appellant had made arrangements to pick up the airline ticket at the travel agent's home near JFK. Appellant arrived at the agent's home with both of his sons and asked if he could leave them with the agent, saying that his wife would pick them up soon. Appellant wrote on the back of his and Lubaina's marriage certificate, which he gave to the agent, that he was leaving his sons to be handed over to his wife. Appellant also signed his car over to the agent. The agent then drove appellant to JFK to catch his flight to Pakistan.

{¶ 16} At 8:10 p.m., Robert Nanni, a police officer stationed at JFK, learned that appellant was a murder suspect and that he had checked in for a flight scheduled to leave for Pakistan at 8:55 p.m. Appellant was located and arrested. Nanni noticed a large laceration on appellant's right thumb. Nanni read appellant his rights and called airport paramedics to attend to appellant's thumb. Among the items confiscated from appellant was an attaché case containing 15 traveler's checks totaling $7,500, his will, and $6,954.34 in cash.

{¶ 17} On October 7, 1999, a grand jury indicted appellant on three counts of aggravated murder for purposely and with prior calculation and design killing Lubaina, Ruhie, and Abdul, pursuant to R.C. 2903.01(A), and one count for the aggravated murder of Nasira, pursuant to R.C. 2903.01(C) (victim younger than 13). All four aggravated murder counts carried a death-penalty specification alleging a course of conduct involving the killing of two or more persons. R.C. 2929.04(A)(5). The aggravated murder count for Nasira carried an additional death-penalty specification alleging that the victim was younger than 13 years at the time of the murder. R.C. 2929.04(A)(9).

{¶ 18} At trial, Dr. Manuel Villaverde, the Belmont County Coroner, testified that he had been called to the crime scene on September 11, 1999. All four

victims appeared to have died from blood loss from slashes on their necks. Based on the condition of the bodies, he determined that the victims had been killed at approximately 3:00 a.m. that day, with two to four hours' variation either way.

{¶ 19} A deputy coroner for Franklin County performed autopsies on all four victims and concluded that each victim had died from skull fractures and a large cut on the neck.

{¶ 20} Diane Larson, a forensic scientist at the DNA-serology section of the Bureau of Criminal Identification and Investigation ("BCI"), concluded that the DNA of blood found in the kitchen of Lubaina's home matched appellant's DNA profile. The probability of someone else in the Caucasian population having that same DNA profile is 1 in 7.6 quadrillion, and in the African–American population, the probability is 1 in 65 quadrillion.

{¶ 21} After deliberating, the jury found appellant guilty as charged. After the mitigation hearing, the jury recommended death, and the court imposed a death sentence on appellant.

{¶ 22} The cause is now before this court upon an appeal as of right.

{¶ 23} Appellant has raised 19 propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's convictions for aggravated murder. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstances against the mitigating evidence. We find that the aggravating circumstance (circumstances, in the case of Nasira) in each murder count outweighs the mitigating factors beyond a reasonable doubt. Therefore, we affirm appellant's sentence of death.

## II. Pretrial/Voir Dire Issues

### A. Failure to Remove Counsel

{¶ 24} In his second proposition of law, appellant asserts that the trial court erred in failing to remove defense counsel, since a conflict of interest occurred when he filed a lawsuit against counsel in federal court. Alternatively, appellant contends that there was a total breakdown of the attorney-client relationship that required counsel's removal. Appellant submits that the trial court's inquiry into the difficulties between him and counsel was insufficient.

{¶ 25} Appellant complained about his counsel on numerous occasions. Appellant was first represented by appointed public defenders at his arraignment. Appellant claimed that counsel had not met with him or answered his questions, but counsel disputed appellant's allegations. Due to conflicts with appellant, both attorneys later withdrew, and by June 2000, the trial court had appointed attorneys Peter Olivito and Adrian Hershey to represent appellant. Although

appellant sought to hire attorneys of his own choosing, he was never able to do so.

{¶ 26} Soon after Olivito and Hershey were appointed, appellant began complaining that their representation was ineffective. At a September 6, 2000 hearing, appellant claimed that counsel had neither met nor consulted with him prior to seeking a continuance. At a November 9, 2000 hearing, appellant complained that Hershey had laughed at and humiliated him in front of a detective, had made racial slurs, and had been hostile toward him. Hershey disputed appellant's complaints, and the court advised appellant to let his counsel help him.

{¶ 27} At a January 2, 2001 hearing, appellant told the court that he had hired attorney Joseph Carpino to represent him and that he had filed a civil rights lawsuit against Olivito and Hershey in federal court and wanted to discharge them.

{¶ 28} On January 8, 2001, the trial court held a hearing on appellant's motion to discharge counsel. Appellant indicated again that he was suing counsel in federal court. He also claimed that he had given his attorneys a list of witnesses, but that in 16 months, neither his first attorneys nor his new attorneys had contacted them and that his new attorneys had "refused to contact them." Olivito explained that many of the witnesses that appellant had named were in Pakistan and that appellant had not provided phone numbers to contact them. Both attorneys told the trial court of their efforts to obtain witnesses and comply with requests by appellant. The trial court concluded that counsel was representing appellant diligently and therefore overruled appellant's motion to discharge them.

{¶ 29} Also at the January 8, 2001 hearing, the court found that Carpino could not serve as appellant's counsel because he was not certified to act as counsel in capital cases. The court overruled Carpino's motion to become appellant's trial counsel.

{¶ 30} Appellant reiterated his dissatisfaction with counsel at a January 11, 2001 suppression hearing. He also complained about counsel at the outset of voir dire, as well as at the mitigation and sentencing hearings.

{¶ 31} Appellant relies on *Smith v. Lockhart* (C.A.8, 1991), 923 F.2d 1314, 1321, citing *Douglas v. United States* (D.C.App.1985), 488 A.2d 121, 136, in claiming that his federal lawsuit against appointed counsel reflected a conflict between his interests and counsel's. Appellant contends that once he raised the issue of a conflict of interest, the trial court was required to allow him to demonstrate that the conflict "impermissibly imperil[ed] his right to a fair trial." See *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333.

{¶ 32} There are strong indications that appellant filed his federal lawsuit simply to get his court-appointed attorneys discharged. Prior to trial, the trial court held hearings regarding appellant's complaints about counsel on November 9, 2000, and January 8, 2001. Upon considering the statements of appellant and counsel, the trial court found no reason to replace counsel. At the conclusion of the November 9 hearing, the trial court urged appellant to let his counsel help him. At the conclusion of the January 8 hearing, the court stated: "The court is comfortable that counsel has represented Mr. Ahmed * * * diligently; that the difficulties which have arisen in this case stem from what Mr. Ahmed himself pinpointed when he said that he does not understand. And the allegations do not have firm footing in law or in fact. The motion to discharge is overruled." Nor did the trial court find any conflict of interest that adversely affected counsel's performance. See *Mickens v. Taylor* (2002), 535 U.S. 162, 171–172, 122 S.Ct. 1237, 152 L.Ed.2d 291. Under these circumstances, we will defer to the trial judge, "who see[s] and hear[s] what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

{¶ 33} We further note that courts "must be wary of defendants who employ complaints about counsel as dilatory tactics or for another invidious motive." *Smith v. Lockhart*, 923 F.2d at 1321, fn. 11, citing *United States v. Welty* (C.A.3, 1982), 674 F.2d 185, 193–194.

{¶ 34} Appellant continually complained about counsel. The trial court took appellant's complaints seriously and listened to all sides before it determined that his complaints were not valid and that counsel should remain as appellant's attorneys. The federal lawsuit appears to have been filed in an attempt to create a conflict so that his counsel would be removed from the case, not a genuine grievance causing a true conflict of interest. Moreover, after the trial court conducted thorough inquiries into the difficulties between appellant and counsel, it found that appellant's complaints against counsel were not substantiated. Nothing offered by appellant compels us to disturb that ruling. See *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus.

{¶ 35} Appellant argues alternatively that even if there was no conflict of interest, there was at least a total breakdown in the attorney-client relationship that necessitated counsel's removal. The trial court, however, addressed appellant's complaints concerning counsel's representation of him at two hearings as stated above. Upon considering appellant's motion for a new trial and his complaints about counsel and claims of counsel's ineffectiveness throughout trial, the trial court held that "[h]ours of testimony [concerning appellant's disagreements with counsel] established that the grounds alleged were not cogent or reliable." In addition, the record reflects many instances where appellant

continued to confer with counsel throughout the proceedings, thus belying his claim that there was a total breakdown in the attorney-client relationship.

{¶ 36} Since appellant did not substantiate his claims of a conflict of interest and of a total breakdown of the attorney-client relationship, we overrule his second proposition.

## B.   Change of Venue

{¶ 37} In his ninth proposition of law, appellant claims that pervasive, prejudicial pretrial publicity about this case saturated Belmont County and thus required a change of venue.   Appellant moved for a change of venue and, in a hearing on that motion, offered 14 articles about the crimes from local newspapers.   The trial court, however, overruled the motion after the jury had been impaneled.

{¶ 38} The trial court has discretion to grant or deny a motion for a change of venue;  its ruling will not be disturbed on appeal unless the court abused its discretion.   See, e.g., *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304.   We have long held that voir dire examination provides the best test as to whether prejudice exists in the community against the defendant precluding a fair trial in the jurisdiction.   *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus;  *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710.   "A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased."   *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; accord *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996.   Even pervasive adverse pretrial publicity does not inevitably lead to an unfair trial.   *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 39} Undoubtedly, there was extensive pretrial publicity about the murders in the local media.   However, the trial court conducted an extensive, individual, sequestered voir dire of prospective jurors, which helped insulate against any negative effect of the pretrial publicity.   *Lundgren,* 73 Ohio St.3d at 479–480, 653 N.E.2d 304.

{¶ 40} The trial court did not abuse its discretion in denying appellant's request for a change in venue.   Similar to the situations in *Treesh,* 90 Ohio St.3d at 464, 739 N.E.2d 749, and *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 28–30, appellant failed to demonstrate that "the publicity in this case was so pervasive that it impaired the ability of the empaneled jurors to deliberate fairly and impartially."

{¶ 41} Moreover, as in *Treesh,* each empaneled juror confirmed during voir dire that he or she had not formed an opinion about the guilt or innocence of the accused, could put aside any information previously heard about the case, and

could render a fair and impartial verdict based on the law and evidence. Thus, appellant has not shown that any biased juror sat on the jury or that the trial court abused its discretion. Accordingly, we reject appellant's ninth proposition.

### C. Failure to Grant a Continuance

{¶ 42} In his tenth proposition of law appellant asserts that the trial court abused its discretion in failing to grant him a continuance at the outset of trial.

{¶ 43} On the day before voir dire began, appellant provided defense counsel a list of approximately 60 potential witnesses that he wanted contacted and interviewed to aid in his defense. The list of names provided no addresses or phone numbers, but only a general description of the area where the potential witnesses might be located, i.e., Pakistan, Washington D.C., Pittsburgh, New York. Defense counsel requested a continuance in order to find and interview these potential witnesses. The state objected, and the trial court denied the continuance, stating: "I believe that if we were to work with this list, we might never have a trial. And so balancing the need to have an efficient administration of justice and the tardy presentation of the list, the court overrules the motion for a continuance."

{¶ 44} We have recognized that " '[t]he grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.' " *State v. Jones* (2001), 91 Ohio St.3d 335, 342, 744 N.E.2d 1163, quoting *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 423 N.E.2d 1078. In evaluating a motion for a continuance, "[s]everal factors can be considered: the length of delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." *State v. Landrum,* 53 Ohio St.3d at 115, 559 N.E.2d 710.

{¶ 45} Appellant asserts that the denial of the continuance resulted in ineffective assistance of counsel. However, the trial court's denial of a continuance did not result in ineffective assistance or reflect an abuse of discretion. The motion was made at the beginning of voir dire, and the list of names of potential witnesses was just that, a list of names. No phone numbers or addresses were provided, only general locations. Moreover, defense counsel Olivito noted when requesting the continuance that when he and Hershey were appointed, more than six months earlier, "we began making inquiry of the defendant as to witnesses that could assist us in either phase of this case."

{¶ 46} At a January 8, 2001 hearing, approximately one week before voir dire began, appellant claimed that he had given names of potential witnesses to counsel but that counsel had never contacted them. Olivito responded that the list that appellant had given him did not include telephone numbers and was

largely made up of people in Pakistan who did not speak English. Appellant then asserted that no one had contacted other potential witnesses who live in the United States and Canada and that "most of that information is available with the sheriff's office, because they confiscated all my phone books * * *." But nothing in the record, beyond appellant's assertions, indicates that appellant had previously relayed that information to counsel. Furthermore, defense counsel noted that none of the witnesses that appellant had named lived in Belmont County.

{¶ 47} Hershey stated that he had contacted appellant's brother in Toronto, Canada, but he had been uncooperative and had hung up on him. Moreover, appellant's own failure to communicate specific information about potential witnesses to his attorneys contributed to the last-minute request for a continuance at the outset of voir dire. Appellant could have easily told counsel earlier that contact information for potential witnesses was in his address books that were in the custody of the sheriff's office.

{¶ 48} Also militating against the requested continuance was the fact that no time period was specified as to the proposed length of the continuance. In addition, the list of potential witnesses contained people who lived in Pakistan, whose testimony could be secured only with difficulty, which suggests that the delay would be significant. Nor did appellant proffer any summary of what the testimony of these witnesses would have been, and thus there is no basis for us to judge the importance of obtaining the continuance. By failing to proffer a description of the testimony, appellant has not preserved the issue. See, e.g., *State v. Davie* (1997), 80 Ohio St.3d 311, 327, 686 N.E.2d 245; *State v. Twyford* (2002), 94 Ohio St.3d 340, 353, 763 N.E.2d 122.

{¶ 49} The inconvenience that would have resulted if a continuance had been granted also supports the trial court's denial of appellant's requested continuance. The venire had been summoned, and an open-ended continuance could have delayed the beginning of trial in the hope that some witnesses could be located, to the inconvenience of all involved with the trial.

{¶ 50} Since the trial court's denial of the requested continuance did not amount to an abuse of discretion, we reject appellant's tenth proposition.

### D. Right to Contact Foreign Consulate

{¶ 51} In his 17th proposition of law, appellant argues that law enforcement officers' failure to advise him, a foreign citizen, of his right to contact his country's consulate pursuant to the Vienna Convention on Consular Relations ("VCCR") deprived him of due process.

{¶ 52} Appellant asserts that both New York and Belmont County law enforcement personnel were aware that he was a Pakistani citizen, since they had seized his Pakistani passport. Appellant contends that even though police officers knew

that he was a Pakistani citizen, they failed to inform him of his absolute right to consular access under the VCCR.

{¶ 53} Appellant contends that he is a citizen of both Pakistan and the United States. Under Section 1448, Title 8, U.S.Code, however, the United States does not recognize the "other citizenship" of a person claiming dual citizenship once the person takes the oath to become a United States citizen. See *United States v. Shahani–Jahromi* (E.D.Va.2003), 286 F.Supp.2d 723, 726, fn. 1.

{¶ 54} Moreover, as the court noted in *United States v. Matheson* (D.C.N.Y. 1975), 400 F.Supp. 1241, 1245: "[I]t is a recognized fact of international law that a dual national is never entitled to invoke the protection or assistance of one of the two countries while within the other country. See *Nishikawa v. [Dulles]*, 356 U.S. 129, 132, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958); *Kawakita v. United States,* 343 U.S. 717, 733, 72 S.Ct. 950, 96 L.Ed. 1249 (1952)."

{¶ 55} Additionally, we have decided that whatever individual rights the treaty may confer are waivable. *State v. Issa* (2001), 93 Ohio St.3d 49, 54–56, 752 N.E.2d 904. As in *Issa,* appellant failed to raise this issue before the trial court and has therefore waived all but plain error. Plain error is absent, since it cannot be said that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894. Appellant's 17th proposition is not well taken.

## III.  Trial Issues

### A.  Competency Issues

{¶ 56} In his first proposition of law, appellant contends that the trial court erred in failing to order a competency evaluation. Appellant submits that there were sufficient indicia of incompetency before and during trial to compel the trial court to order a competency evaluation.

{¶ 57} Near the end of the guilt phase, appellant filed a handwritten motion to have his competency evaluated. He asserted that he was having "extreme pain in the brain and head and * * * frequent blackouts and vertigo attacks." The court asked the jail's physician to examine appellant, but appellant refused to be examined by anyone other than his own doctor from Columbus.

{¶ 58} The court then held a hearing, without the jury present, in which appellant and several employees of the Belmont County Jail testified. Appellant claimed that he had vertigo and that his head was hurting, and that he had been suffering from these problems during the 16 months that he had been in jail. But employees at the jail who saw him on a daily basis rebutted his testimony. They testified that appellant had never complained of any medical, mental, or psychological conditions until the day he filed the motion for the competency

evaluation. The trial court then held that appellant had not established good cause for the court to order a competency evaluation.

{¶ 59} Appellant argues that the trial court erred and cites a number of instances in which his behavior should have prompted the court to order a competency evaluation. First, appellant notes that the court was aware that no attorney could please him. At five different hearings, appellant complained about counsel and lodged numerous allegations that counsel were not listening to his requests or working on his case.

{¶ 60} Second, appellant points to his suspicions that jail personnel were spying on him. During the mitigation hearing, Dr. Smalldon stated that appellant believed that jail personnel were monitoring everything he said and wrote.

{¶ 61} Third, appellant claims that the court knew that appellant was seeing conspiracies everywhere. Before the court, he accused his counsel of colluding with the prosecutor. He made accusations, in numerous pro se pleadings, that the trial judge was conspiring to deprive him of his rights. Appellant felt that the jail staff were part of the prosecution and that the jail physician was biased against him.

{¶ 62} Fourth, appellant cites his failure to understand the proceedings and his inability to respond on point to questions asked him.

{¶ 63} Last, appellant points to Dr. Smalldon's penalty-phase testimony that appellant has a delusional disorder of the persecutory type.

{¶ 64} R.C. 2945.37 requires a competency hearing if a request is made before trial. But "[i]f the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion." R.C. 2945.37(B). Thus, "the decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion." *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401. The right to a hearing "rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, citing *Drope v. Missouri* (1975), 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103, and *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

{¶ 65} There was no request before trial to evaluate appellant's competency. When appellant requested a competency evaluation during trial, the trial court received testimony from him and jail personnel and concluded that he had not established good cause for the court to hold a hearing on the issue. This case is similar to *State v. Smith* (2000), 89 Ohio St.3d 323, 329, 731 N.E.2d 645, wherein

the record did not reflect "sufficient indicia of incompetence" to have required the trial court to conduct a competency hearing.

{¶ 66} Although Dr. Smalldon testified that appellant suffers from a severe mental illness, "[t]he term 'mental illness' does not necessarily equate with the definition of legal incompetency." *State v. Berry*, 72 Ohio St.3d 354, 650 N.E.2d 433, at the syllabus. "A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016. In fact, as the trial court noted when it denied appellant's motion, appellant was able to prepare the motion for a competency evaluation himself using correct legal terms. We also note that the record shows that appellant assisted counsel subsequent to the motion.

{¶ 67} Nor did defense counsel enter an insanity plea or suggest that appellant lacked competency, unlike counsel in *State v. Were* (2002), 94 Ohio St.3d 173, 176, 761 N.E.2d 591, who continually raised the issue of defendant's competency. Counsel had ample time to become familiar with appellant, since they represented him from June 2000 through the February 2001 sentencing. Although appellant repeatedly complained about his counsel—making allegations that counsel disputed—counsel never questioned his competency. If counsel had some reason to question appellant's competency before the filing of appellant's handwritten motion, counsel surely would have done so. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 411, 692 N.E.2d 151.

{¶ 68} Neither appellant's behavior at trial nor any testimony presented on his behalf provided "good cause" to hold a hearing on his competency or "sufficient indicia of incompetence." Moreover, deference on such issues should be granted to those "who see and hear what goes on in the courtroom." *State v. Cowans*, 87 Ohio St.3d at 84, 717 N.E.2d 298; *State v. Smith*, 89 Ohio St.3d at 330, 731 N.E.2d 645. Accordingly, we overrule appellant's first proposition.

{¶ 69} In his 11th proposition of law, appellant contends that the trial court abused its discretion in precluding him from offering rebuttal evidence on the issue of whether he had established good cause to hold a competency hearing. However, this argument is also not well taken. Nothing in R.C. 2945.37 required the court to hold a hearing to determine good cause or allow rebuttal testimony. Nor was there any proffer of evidence to demonstrate that appellant had credible rebuttal evidence. In sum, appellant was not prejudiced by the trial court's refusal to allow him to rebut the jail staff's testimony.

## B. Hearsay

{¶ 70} In his third proposition of law, appellant argues that the admission of hearsay evidence regarding Lubaina's fear of appellant and the reasons for her fear deprived him of a fair trial.

{¶ 71} Grace Hoffman, Lubaina's divorce attorney, testified that Lubaina had been afraid of appellant. On cross-examination, defense counsel elicited from Hoffman that Lubaina had described appellant as controlling and manipulative and that Lubaina had told her that appellant had been violent during the marriage, including "forced sex" and "some striking." On redirect, Hoffman again stated that Lubaina had been afraid of appellant during the divorce proceedings.

{¶ 72} Tahira Khan, Lubaina's sister, also testified that Lubaina had been afraid of appellant. The second time this was elicited from Khan, the defense objected and the court essentially advised the prosecutor to limit his questions to adducing testimony that Lubaina had feared appellant and not the reasons behind the fear.

{¶ 73} Khan also testified that when she had asked Lubaina why, with all the problems in the marriage, she and appellant had had a second child, Lubaina had told her, "He raped me." The defense did not object to this testimony.

{¶ 74} In *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21–22, 514 N.E.2d 394, this court held that evidence that a victim had a fearful state of mind was admissible as a hearsay exception under Evid.R. 803(3), as a statement of "then existing state of mind, emotion, sensation, or physical condition." However, the reasons or basis behind the victim's fearful state of mind would not be admissible under this exception. This court has followed the reasoning in *Apanovitch* in subsequent cases. See *State v. Simko* (1994), 71 Ohio St.3d 483, 491, 644 N.E.2d 345; *State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000; *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 677–678, 687 N.E.2d 1358. With regard to testimony of fear elicited in this case, the trial court properly allowed the testimony. No testimony was admitted over objection as to the basis of the victim's fear.

{¶ 75} With regard to the testimony that appellant had "forced sex" on Lubaina, defense counsel elicited this statement on cross-examination. Any error in admitting this testimony and Khan's subsequent testimony that appellant had raped Lubaina was invited error, since the defense first elicited the testimony. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 102. The defense opened the door to Khan's remark about rape based on its cross-examination of Hoffman. See *State v. Davie*, 80 Ohio St.3d at 322, 686 N.E.2d 245.

{¶ 76} Moreover, since no objection was raised, appellant has waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916. In view of the strong and compelling evidence of appellant's guilt, any error was not plain error affecting the outcome of his trial. *State v. Long* (1978), 53 Ohio St.2d

91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Accordingly, we overrule appellant's third proposition.

## C. Other–Acts Evidence

{¶ 77} In his fourth proposition of law, appellant contends that the trial court admitted improper character and other-acts evidence throughout the trial.

{¶ 78} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The exceptions allowing the evidence "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶ 79} However, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Thus, we review the trial court's decision with an abuse-of-discretion standard. See *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233; *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.

{¶ 80} By failing to object at trial to any of the instances he refers to in arguing this proposition, appellant waived all but plain error. *State v. Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916. Appellant fails to demonstrate plain error.

{¶ 81} Appellant asserts that the court allowed impermissible character evidence when Lubaina's attorney, Grace Hoffman, was permitted to read portions of appellant's August 18, 1999 divorce-proceeding deposition during her testimony. Appellant contends that the deposition was irrelevant and that it was introduced to demonstrate that he was long-winded and evasive. But such characteristics do not imply that he had a propensity to commit crime. Moreover, the passages read by Hoffman tended to show that appellant had been suspicious that Lubaina was having an affair and thus related to appellant's motive:

{¶ 82} "That was surprising to know that my wife didn't want any present from me but she brought home flowers on Valentine's Day given by somebody else, which definitely was something strange to me that somebody was giving [a] Valentine gift to my wife at the hospital * * *."

{¶ 83} Another deposition passage read by Hoffman concerned appellant's explanation of why he had secretly applied for passports for his two sons. This testimony helped show that appellant had planned in advance to leave the country. Appellant had initially planned to take his sons with him on the flight to

Pakistan. Thus, the testimony was admissible because it tended to show prior calculation and design.

{¶ 84} Appellant next complains that Deputy Forro's testimony regarding Lubaina's complaint that he was harassing her by phone tended to show his bad character. However, this testimony tended to show the escalating acrimony between appellant and Lubaina.

{¶ 85} Testimony from Lubaina's sister Tahira Khan that appellant had repeatedly raped Lubaina should not have been allowed. However, appellant did not object, and defense counsel had elicited the rape allegations earlier in the trial through Lubaina's divorce attorney. Given the substantial evidence of appellant's guilt, this evidence was not outcome-determinative. *State v. Getsy* (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866.

{¶ 86} In addition, testimony by Khan that appellant had refused to help Lubaina comfort one of their sons, who was upset that his mother was leaving him with his father for a visit, was harmless. Testimony that appellant came to Lubaina's house in February 1999 and "started flinging things all over the floor" was also harmless and did not affect the outcome of appellant's trial.

{¶ 87} Appellant also asserts that the trial court should have provided a limiting instruction as to testimony about his behavior during the divorce proceedings. Yet appellant failed to request a limiting instruction, and the lack of such an instruction did not amount to plain error. See *State v. Frazier*, 73 Ohio St.3d at 339, 652 N.E.2d 1000.

{¶ 88} Given the admissibility of some of the alleged other-acts evidence and the lack of plain error with regard to the inadmissible evidence, we overrule appellant's fourth proposition.

## D. Failure to Declare a Mistrial

{¶ 89} In his eighth proposition of law, appellant contends that the trial court erred in failing to declare a mistrial after Officer Nanni testified that when appellant was arrested at JFK and Nanni asked him what happened to his thumb, appellant had replied: "I want to speak to my lawyer."

{¶ 90} Defense counsel did not object to Nanni's comment, but shortly after the comment was made, the prosecutor informed the court, away from the jury, that he had inadvertently elicited the response from Nanni that appellant had asked to speak with his attorney. The prosecutor suggested, and defense counsel requested, that a curative instruction be given. The court then instructed the jury: "A few moments ago, the witness stated that during police interrogation, the defendant requested the right to counsel. You are instructed to disregard the defendant's request to speak to counsel. Each of us has an absolute right to have

counsel present during any police interrogation. You are to infer nothing from his having requested the right to speak to counsel."

{¶ 91} The testimony elicited from Nanni was improper, since the assertion of the right to counsel must not be used against the accused. *State v. Combs* (1991), 62 Ohio St.3d 278, 280–281, 581 N.E.2d 1071. See, also, *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91; *Wainwright v. Greenfield* (1986), 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623, fn. 13; *State v. Treesh*, 90 Ohio St.3d at 479, 739 N.E.2d 749. However, the trial court's curative instruction prevented any prejudice.

{¶ 92} The trial court did not err in not sua sponte declaring a mistrial at that point. The determination of whether to grant a mistrial is in the discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42. "[T]he trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial." *Glover*, 35 Ohio St.3d at 19, 517 N.E.2d 900; see, also, *State v. Williams* (1995), 73 Ohio St.3d 153, 167, 652 N.E.2d 721. This court will not second-guess such a determination absent an abuse of discretion.

{¶ 93} No abuse of discretion occurred. The trial court issued a curative instruction shortly after the jury heard Nanni's improper statement. The jury can be presumed to have followed the court's instructions, including instructions to disregard testimony. *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082; *State v. Zuern* (1987), 32 Ohio St.3d 56, 62, 512 N.E.2d 585. The curative instruction by the court was similar to that upheld in *State v. Treesh*, 90 Ohio St.3d at 480, 739 N.E.2d 749, in a similar factual context. Accordingly, appellant's eighth proposition is overruled.

### E. Gruesome Photos

{¶ 94} In his 12th proposition of law, appellant asserts that gruesome crime-scene photos, autopsy slides, and videotape that were admitted were irrelevant, unnecessary, cumulative, and repetitive and prejudiced him.

{¶ 95} Under Evid.R. 403, the admission of photographs is left to a trial court's sound discretion. *State v. Landrum*, 53 Ohio St.3d at 121, 559 N.E.2d 710; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 473 N.E.2d 768. Nonrepetitive photographs in a capital case, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. Id. at paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257–258, 513 N.E.2d 267.

{¶ 96} Eight crime scene photos were admitted over appellant's objections, and they are gruesome. State's Exhibit 6 depicts the body of Abdul Bhatti on the

garage floor. State's Exhibit 15 shows the doorway area between the basement and garage where the bodies of Ruhie and Abdul can partially be seen. State's Exhibit 16 depicts the bodies of Lubaina, Ruhie, and Nasira on the basement floor, and although it is repetitive of State's Exhibit 25, any error in admitting it was harmless. State's Exhibits 17, 18, 19, and 20 are individual close-up photos of the heads of the four murder victims. State's Exhibit 21 is a crime-scene videotape, and portions of it are repetitive of the crime-scene photos.

{¶ 97} However, all of the photos and the videotape helped to prove the killer's intent and illustrated the testimony of detectives who described the crime scene. These photos and video also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. The trial court did not abuse its discretion in deciding that the probative value of each one outweighed any prejudicial effect. Some of the photos and videotape were repetitive, but their admission did not materially prejudice appellant.

{¶ 98} Appellant also claims that he was prejudiced by the admission of the autopsy slides of the four victims. Appellant raised no specific objection.

{¶ 99} Many of the autopsy slides are gruesome. However, the slides illustrated the coroner's testimony in describing the multiple injuries sustained by all four victims. The slides also helped to prove the killer's intent. The trial court did not abuse its discretion in deciding that the probative value of each one outweighed any prejudicial effect. Any repetition did not materially prejudice appellant.

{¶ 100} In addition, the trial court did not err in readmitting seven crime-scene photos during the penalty phase. A trial court may properly allow repetition of much or all that occurred in the guilt phase pursuant to R.C. 2929.03(D)(1). See, e.g., *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542; *State v. Vrabel*, 99 Ohio St.3d 184, 2003–Ohio–3193, 790 N.E.2d 303, ¶ 73. The photos in question helped demonstrate the aggravating circumstances in this case. Appellant's claims of prejudice are not persuasive. Therefore, we overrule appellant's 12th proposition.

## F. Jury Instructions

{¶ 101} In his 18th proposition of law, appellant contends that the trial court erred in instructing the jury on reasonable doubt based on the statutory definition in R.C. 2901.05. We have repeatedly rejected the same argument, and do so again for the same reasons. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300.

### IV. Penalty–Phase Issues

#### A. Sentence Appropriateness

{¶ 102} In his seventh proposition of law, appellant argues that his death sentence is inappropriate because his background and mental disease militate against such a sentence. We will consider appellant's arguments later in this opinion as part of our independent review of sentence.

#### B. Failure to Allow Pro Se Representation

{¶ 103} In his 13th proposition of law, appellant submits that the trial court deprived him of due process and the right to conduct his own defense when the court declined to accept his waiver of counsel at the beginning of the penalty phase. Appellant contends that *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, guarantees him the right to waive assistance of counsel and proceed pro se.

{¶ 104} If a trial court denies the right of self-representation, when properly invoked, the denial is per se reversible error. *State v. Reed* (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122. However, in this case, the right of self-representation was not properly invoked. See *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 49–53.

{¶ 105} At the beginning of the penalty phase, appellant gave the trial court a pro se motion "to exercise his right to self representation under the circumstances and thus hereby discharge the appointed counsels." The court explained to appellant the right that he was waiving and what representing himself would entail. The court then gave appellant a docket entry to sign that stated: "Being fully advised of my rights, I hereby elect to represent myself." Appellant signed the form but also wrote on the docket entry: "I have not been allowed the rights under Constitution and as given in Constitution and Crim.R. 10 and 44 to continuance and representation by selection counsel and even to represent myself alone without the presence of court appointed counsels to whom I have sued in the civil case C2–001–0013 in Federal Court. There has been no defense, no defense witnesses and almost no investigation to justify 16 months of delay or period before trial and—."

{¶ 106} The trial court then addressed appellant and repeatedly asked him whether he understood his rights and wanted to waive them. Appellant did not give a clear answer. The court then held: "When I read the comments that you have written on the docket entry, I find that you have failed to effectively sign the entry that was prepared by the court; that the soliloquy [sic] has failed and that you have not, in fact, elected to undertake self representation. We will proceed. Counsel will represent you."

{¶ 107} The trial court correctly found that appellant did not unequivocally and explicitly invoke his right to self-representation. See *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37–38. "The constitutional right of self-representation is waived if it is not timely and unequivocally asserted." *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888; see, also, *United States v. Frazier–El* (C.A.4, 2000), 204 F.3d 553, 558 (assertion of the right of self-representation "must be * * * clear and unequivocal").

{¶ 108} Given these circumstances, appellant's 13th proposition is not well taken.

## C. Jury Instructions

{¶ 109} In his 14th proposition of law, appellant complains about the following penalty-phase instruction: "For purposes of this proceeding, only that testimony and evidence which was presented in the first phase that is relevant to the aggravating circumstance or circumstances Defendant was found guilty of committing and to any of the mitigating factors that will be described below, is to be considered by you." Appellant asserts that this instruction improperly left it up to the jury to determine what guilt-phase evidence was relevant in its sentencing deliberations.

{¶ 110} As in *State v. Jones*, 91 Ohio St.3d at 349–350, 744 N.E.2d 1163, appellant failed to raise this issue before the trial court and has therefore waived all but plain error. See, e.g., *State v. Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916. The instruction might have been interpreted to mean that jurors had to determine which evidence that had been presented during the guilt phase was relevant to the penalty phase. As we noted in *State v. Getsy*, 84 Ohio St.3d at 201, 702 N.E.2d 866, it is "the trial court's responsibility, not the jury's, to determine what evidence [is] relevant."

{¶ 111} However, no outcome-determinative plain error occurred. As in *Jones*, the ambiguous instruction did not determine the outcome of the case because "[m]uch of the trial phase evidence was relevant at the sentencing phase because it was related to the aggravating circumstances, the nature and circumstances of the offense, and the asserted mitigating factors. See *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus." *Jones*, 91 Ohio St.3d at 350, 744 N.E.2d 1163. As noted in *Jones*, evidence of the nature and circumstances of the aggravating circumstances is also relevant at the penalty phase. Most of the evidence admitted in the guilt phase was also admissible during the penalty phase. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 90. Therefore, we overrule appellant's 14th proposition.

### D. Sentencing Opinion

{¶ 112} In his 15th proposition of law, appellant argues that the trial court's sentencing opinion was inadequate and did not comply with the requirements of R.C. 2929.03(F). Appellant's arguments are not well taken.

{¶ 113} First, appellant points to an error in the court's sentencing opinion, which states that the jury heard the "testimony of the defendant" in mitigation, when in fact, appellant never testified. This misstatement was harmless. Moreover, we have independently evaluated the sentence and thereby rectified any error in the sentencing opinion. *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124.

{¶ 114} Appellant also claims that the sentencing opinion fails to define how much weight the court gave to the mitigating evidence. But when a defendant introduces evidence in mitigation, a trial court is not required to accept it as mitigating or assign it any weight. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. And although the trial court did fail to explain its weighing process, inadequate explanations do not create reversible error. *State v. Fox,* 69 Ohio St.3d at 190, 631 N.E.2d 124. Any error in the trial court's sentencing opinion can be cured by our independent review. See, e.g., *State v. Lott* (1990), 51 Ohio St.3d 160, 170–173, 555 N.E.2d 293; *State v. Raglin* (1998), 83 Ohio St.3d 253, 257, 699 N.E.2d 482; *State v. Cooey* (1989), 46 Ohio St.3d 20, 38, 544 N.E.2d 895 (failure to separately weigh the aggravating circumstances of each murder count against the mitigating factors can be cured by independent review). Accordingly, we overrule appellant's 15th proposition.

### E. Alternate Jurors in Deliberation Room

{¶ 115} In his 16th proposition of law, appellant argues that the trial court erred by permitting the alternate jurors to sit in on deliberations during both phases of the trial in violation of Crim.R. 24(F).

{¶ 116} The trial court clearly erred in allowing the alternate jurors to sit in on deliberations during both phases of trial, even though the defense agreed to it and the trial court admonished the alternates not to participate in the deliberations. As we held in *State v. Murphy* (2001), 91 Ohio St.3d 516, 531–534, 747 N.E.2d 765, and *State v. Jackson* (2001), 92 Ohio St.3d 436, 438–440, 751 N.E.2d 946, Crim.R. 24(F) prohibits the presence of alternate jurors in the jury deliberation room.

{¶ 117} Because appellant failed to object, all error is waived save plain error. *Murphy,* 91 Ohio St.3d at 532, 747 N.E.2d 765. Plain error is absent in this case. Appellant does not allege, nor does the record reveal, that the alternate jurors participated in the deliberations either " 'verbally or through "body language" [or

that] alternates' presence exerted a "chilling" effect on the regular jurors.'" *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 135, quoting *United States v. Olano* (1993), 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508.

{¶ 118} Thus, appellant fails to demonstrate that he was in fact prejudiced by the presence of the alternate jurors. See *State v. Murphy,* 91 Ohio St.3d at 531–534, 747 N.E.2d 765; *State v. Jackson,* 92 Ohio St.3d at 439–440, 751 N.E.2d 946. This court will not ordinarily presume prejudice. Id. at 439, 751 N.E.2d 946. Accordingly, we reject appellant's 16th proposition.

## V. Prosecutorial Misconduct

{¶ 119} In his fifth proposition of law, appellant alleges that he was denied a fair trial because of prosecutorial misconduct throughout the trial. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

### A. Guilt phase

{¶ 120} Appellant first complains that the prosecutor referred to the death sentence during both opening and closing statements. References to the death penalty during the guilt phase were condemned by the United States Supreme Court in *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144. In *Darden* the prosecutor implied that imposing the death penalty would be the only guarantee against a future similar act. Id. at 180, 106 S.Ct. 2464, 91 L.Ed.2d 144. Nevertheless, the court held that the comments did not deprive Darden of a fair trial. See, also, *State v. Brown* (1988), 38 Ohio St.3d 305, 316, 528 N.E.2d 523 ("counsel should not comment on matters not at issue in the trial"). Appellant failed to object and thus waived all but plain error. The remarks made did not amount to plain error. In addition, the trial court instructed the jury that opening and closing statements were not evidence.

{¶ 121} Appellant next complains that the prosecutor referred to evidence not presented at trial. Before trial, the prosecutor informed the court that it would not call a police officer who had taken a domestic-violence report from Lubaina in 1994. But then in his opening statement, the prosecutor stated: "Like many women in her situation, she filed reports with the authorities, but never followed through." Appellant claims that the prosecutor promised one thing to the parties and the court but then submitted evidence through the "back door" by vouching to the jury that it existed.

{¶ 122} Appellant is incorrect. The prosecution never stated that it would not present any evidence of domestic-violence reports, only that it would not present the 1994 report. The prosecution did present evidence that Lubaina had

complained of telephone harassment when Deputy Steve Forro testified that he had responded to a March 1999 complaint by Lubaina. He also testified that Lubaina had decided to handle the problem through her divorce proceedings.

{¶ 123} Appellant also contends that the state failed to disclose before trial, as required by Crim.R. 16, that appellant had told Officer Nanni at the time of his arrest that he had come from St. Clairsville. Appellant argues that this prejudiced his defense, since it placed him in the vicinity of the murders, instead of Columbus, where he resided.

{¶ 124} Yet the defense failed to object and thus did not give the trial court an opportunity to fashion a remedy, assuming that there was a violation of Crim.R. 16. See Crim.R. 16(E)(3). Moreover, evidence not disclosed is deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. See *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus. Even if this information had been disclosed by the prosecution, the outcome of the trial would not have been different.

{¶ 125} Appellant also claims that the prosecutor improperly elicited testimony that Lubaina had feared appellant and that appellant had raped her. However, as discussed earlier regarding appellant's third and fourth propositions of law, that testimony was either proper or did not affect the outcome of appellant's trial.

{¶ 126} Appellant next claims that misconduct occurred during the state's guilt-phase closing argument when the prosecutor (1) vouched for state's witnesses, (2) made derogatory comments about defense counsel's trial tactics, and (3) speculated about evidence that was not presented at trial. Appellant did not object to any of the claimed misconduct at trial. His claims are therefore waived. *State v. Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d 916. Even assuming that these comments were improper, we find that they did not determine the outcome of appellant's trial. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883 (whether improper remarks constitute prosecutorial misconduct requires analysis as to [1] whether the remarks were improper and, [2] if so, whether the remarks prejudicially affected the accused's substantial rights).

### B. Penalty phase

{¶ 127} Appellant next claims misconduct in the prosecutor's cross-examination of the defense's mitigation expert, Dr. Jeffrey Smalldon. Appellant claims that the prosecutor was abusive and tried to discredit Smalldon's testimony based on Smalldon's general opposition to the death penalty. However, the prosecutor's questioning was not improper, but was designed to detect bias in Smalldon and thereby discredit his findings of mitigating evidence in favor of appellant.

{¶ 128} Appellant did not object to any other claimed misconduct during Smalldon's cross-examination. His claims are therefore waived. *State v. Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 129} Appellant further contends that the following comments made during penalty-phase closing argument denigrated defense counsel:

{¶ 130} "The defense has a little more leeway. * * * They essentially can say anything they want. Had I dared quote anything from the Bible, there would have been an objection and the judge would have silenced me at once."

{¶ 131} "So that's the procedure to keep us away from these emotional appeals, where he quotes from the Bible; I quote from the Bible. He quotes again; I quote again, and instead of a court of law, we're here at a prayer meeting."

{¶ 132} "Ladies and gentlemen, your common sense has brought you this far. Don't abandon it now just because somebody quotes from the Bible. I wonder if those four innocent victims were given a chance to pray before their throats were slashed."

{¶ 133} These comments were made in reply to the defense's closing argument employing biblical references such as God did not sentence Cain to death for killing Abel, Christ pronounced that "we should turn the other cheek," and Christ sought mercy for his killers. While the prosecutor's remarks were theatrical, they were provoked by defense counsel's argument. In any event, none of these comments affected appellant's substantial rights.

{¶ 134} Appellant next complains about the prosecutor's speculating how many "pounds" of weight should be accorded to the aggravating circumstances and the mitigating factors. Appellant's objection on this point was correctly overruled by the trial court, as we have noted that "[a] prosecutor can freely argue the weight to be given to potentially mitigating factors." *State v. Loza* (1994), 71 Ohio St.3d 61, 82, 641 N.E.2d 1082. In addition, the question "What's the weight you give to four innocent lives taken the way they were taken?" does not necessarily suggest, as appellant submits, that the prosecutor was inviting the jury to weigh the nature and circumstances of the offenses as aggravating circumstances, which would violate our holding in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus. "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, citing *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431.

{¶ 135} Appellant also contends that the prosecutor attempted to lessen the jurors' responsibility for imposing a death sentence by saying, "[M]aybe some day, when I'm retired and gone from here, they might actually consider executing

somebody." But the defense objected, and the trial court sustained the objection and instructed the jury to disregard the comment.

{¶ 136} As appellant claims, the prosecutor did attack his character when he commented: "[H]e's just a bad person who does bad, evil things." But this characterization was part of the prosecutor's argument that the psychological evidence was not mitigating and that appellant was not delusional or "sick" when he killed the victims. The jury must consider the defendant's character under R.C. 2929.04(B), and the prosecutor can argue the merits of his cause.

{¶ 137} Appellant also complains that prosecutorial comments on Dr. Small- don's testimony were an attack on the value of psychiatric evidence. Yet the prosecutor opened these comments by stating: "I believe that psychology can be a good thing, if it's used for good purposes. * * * But you know, psychology can be misused." The prosecutor continued by questioning Smalldon's expert opinion that appellant was delusional during the murders.

{¶ 138} However, appellant's failure to object waived all but plain error, and there is no plain error. Appellant relies upon *Gall v. Parker* (C.A.6, 2000), 231 F.3d 265, 313–314, but *Gall* is readily distinguishable. In *Gall*, the court found the comments by the prosecutor to be an attack on the legitimacy of the defense of insanity, a defense that had been enacted by the legislature. In this case, the prosecutor merely questioned Smalldon's expert opinion and did not attack the legitimacy of a mental disease or defect as a mitigating factor.

{¶ 139} Last, appellant contends that even though defense counsel failed to object to some of the prosecutorial comments that he now claims were improper, this court can examine them, individually and collectively, for prejudicial effect. See *State v. Fears* (1999), 86 Ohio St.3d 329, 354–355, 715 N.E.2d 136 (Moyer, C.J., concurring in part and dissenting in part). We have examined them, and none of the comments by the prosecutor compel a reversal, either individually or collectively.

{¶ 140} Based on the foregoing, we overrule appellant's fifth proposition.

## VI. Effective Assistance

{¶ 141} In his sixth proposition of law, appellant argues that trial counsel rendered ineffective assistance. Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 141–142, 538 N.E.2d 373. However, in no instance does appellant demonstrate "a reasonable probability that, were it not for counsel's errors, the

result of the trial would have been different." Id. at paragraph three of the syllabus.

## A. Voir dire

{¶ 142} Appellant asserts that counsel failed to adequately question prospective jurors on their racial and religious biases, particularly because of issues that were raised during the trial. For example, the prosecutor argued that the murders were honor killings, born of religious extremism. In addition, the state introduced evidence about appellant's religion and his religious views on divorce. Moreover, Dr. Smalldon observed that appellant had fled Pakistan because of religious persecution.

{¶ 143} However, "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St.3d at 247, 586 N.E.2d 1042. As we noted in *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, under *Turner v. Murray* (1986), 476 U.S. 28, 37, 106 S.Ct. 1683, 90 L.Ed.2d 27, fn. 10, "the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel." The same applies to a decision to voir dire on religious prejudice.

{¶ 144} Defense counsel did voir dire on racial and religious prejudice with regard to some, but not all, prospective jurors. We will normally defer to defense counsel's judgment in voir dire and not find ineffective assistance. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189.

{¶ 145} Appellant also contends that counsel failed to adequately probe prospective jurors about their experience with or views on domestic violence and incorrectly recited the burden that the defense would have if a penalty phase were required, by stating that, to avoid a death sentence, the mitigating factors had to outweigh the aggravating circumstances.

{¶ 146} With regard to domestic violence, counsel questioned some prospective jurors on the topic and may have decided that the examination of other jurors' views would be unwise. Again, we ordinarily refrain from second-guessing counsel's trial strategy. Id.

{¶ 147} While counsel's comments during voir dire did incorrectly describe the defendant's burden in the penalty phase, the errors were harmless. The trial court's correct instruction of the law with regard to the weighing process cured counsel's much earlier misstatements. *State v. Loza*, 71 Ohio St.3d at 79, 641 N.E.2d 1082; *State v. Jackson* (1991), 57 Ohio St.3d 29, 40, 565 N.E.2d 549. The jury is presumed to follow the instructions given to it by the trial judge. *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237.

{¶ 148} Appellant also claims that counsel failed to adequately challenge the venire or present evidence of the percentage of minorities in Belmont County to

show that the venire was composed unconstitutionally. Appellant did object to the venire as not representing a true cross section of the community, but the trial court overruled the objection and noted that the issue could be raised again if specifics were asserted. At the close of voir dire, counsel moved to dismiss the jury panel as not representing a proper cross section of the community, since there was only one non-Caucasian person on the venire.

{¶ 149} A defendant is entitled to a jury "drawn from a source fairly representative of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690. Counsel did object to the composition of the venire but did not present evidence on minorities in Belmont County. In any event, appellant fails to show prejudice or a reasonable probability that were it not for this error, the result of the trial could have been different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

## B. Guilt Phase

{¶ 150} Appellant next argues that defense counsel robbed him of the presumption of innocence during opening statement when counsel mentioned that the prosecutor would seek a death sentence if appellant were found guilty. The jurors knew, however, that they were seated in a capital trial, and counsel simply reminded the jurors that appellant's life was at stake.

{¶ 151} Appellant complains that counsel failed to authenticate e-mails that he had exchanged with his employer that would have shown a benign explanation for appellant's attempted trip to Pakistan after the murders. The e-mails were rejected for lack of authentication. However, even if these e-mails had been admitted, they would not have changed the result of appellant's trial.

{¶ 152} Appellant asserts that counsel were ineffective for failing to request a competency evaluation and for failing to object to the trial court's denial of appellant's midtrial request for a competency evaluation. But as discussed regarding appellant's first proposition of law, the trial court acted properly in rejecting appellant's request and there was insufficient indicia of incompetency to justify an evaluation.

{¶ 153} Appellant contends that counsel failed to adequately prepare and investigate his case due to other trial obligations. Defense counsel Olivito informed the trial court in June of 2000 that he would be defending another capital case in September of that year, as well as a federal case in November. Olivito told the court that his earliest trial availability would be January 2001, when trial, in fact, took place. Despite Olivito's busy schedule, however, he and defense co-counsel Hershey met and discussed appellant's case "at least twice a week" beginning in July 2000. Appellant fails to demonstrate that Olivito's

performance was deficient. This court will not infer failure to investigate from a silent record. *State v. Murphy*, 91 Ohio St.3d at 542, 747 N.E.2d 765.

{¶ 154} Appellant next complains that he was prejudiced when defense counsel elicited testimony from state's witness Grace Hoffman that appellant had been violent toward Lubaina and had forced sex on her. As we determined in the discussions regarding appellant's third and fourth propositions of law, this testimony did not affect the outcome of his trial nor deprive appellant of a fair trial.

## C. Penalty Phase

{¶ 155} Appellant asserts that counsel was deficient during opening statement of the penalty phase by reciting all of the statutory mitigating factors and commenting that most were not applicable in this case. While this was not helpful to appellant's case, it was not prejudicial.

{¶ 156} Appellant further claims that defense counsel failed to adequately investigate and prepare for the penalty phase. Again, appellant raises generalities but no specifics as to what other mitigating evidence was available. Appellant did not provide counsel with his list of approximately 60 potential witnesses until the onset of trial. And the list did not include contact information. Appellant fails to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 157} Appellant argues next that counsel failed to request the assistance of a "cultural expert" and a foreign-language interpreter. However, appellant's assertions that these experts would have helped his defense are speculative at best. In *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus, we recognized that a trial court must provide funds for an indigent criminal defendant when the defendant has made a particularized showing of a reasonable probability that experts would aid the defense.

{¶ 158} The record, however, does not support appellant's assertions that these experts would have helped his defense. In fact, appellant employed a psychiatrist, Dr. Jeffrey Smalldon, who testified in mitigation, describing appellant's mental and emotional problems and his background in Pakistan. Moreover, the record does not show that defense counsel failed to investigate whether these experts would help appellant's case. This court will not infer failure to investigate from a silent record. *State v. Murphy*, 91 Ohio St.3d at 542, 747 N.E.2d 765.

{¶ 159} Appellant also argues that during penalty-phase closing argument, defense counsel encouraged the jury to impose death. Appellant cites several statements that he claims were attacks against him: (1) "I've spoken about the brutality of these crimes. * * * But ladies and gentlemen of the jury, shouldn't

we be considered here to be better than Nawaz? In your own thinking, shouldn't we all be better than Nawaz?" (2) "Because I, quite frankly, think—and I can stand here and look you in the eye and tell you—I think you are better than Nawaz, and I think I am better than Nawaz, and I think everybody in this courtroom is." (3) "Ladies and gentleman, Nawaz dealt the cards that he was given. I don't think he did it wisely. I don't think he did it justly and I don't think you do, either." (4) "And I know—I know the other side of that coin, those victims weren't big; those victim weren't strong. One of them was a very, very young child. One of them was a very, very old and fragile father."

{¶ 160} Defense counsel made these comments after the jury had already found appellant guilty of all four murders. In context of the entire closing argument, counsel was trying to persuade the jurors to think beyond "an eye for an eye," to persuade them that although appellant thought that killing would solve his problems, they could think "better than Nawaz" and opt not to give him a death sentence. In any event, the complained-of statements by counsel were part of a trial strategy meant to convince the jury to not impose a death sentence. Even if some statements were questionable, they do not compel us to find ineffective assistance. *State v. Clayton,* 62 Ohio St.2d at 49, 16 O.O.3d 35, 402 N.E.2d 1189.

{¶ 161} Appellant next contends that counsel failed to tell him about his right of allocution so that he was not prepared for the sentencing hearing. He also claims that his counsel encouraged the judge to impose a death sentence by stating that if appellant were "put to death, that would probably be merciful." Neither of these things prejudiced appellant.

{¶ 162} With regard to counsel's failure to prepare appellant for the sentencing hearing, it is noteworthy that during allocution, the trial judge explained the purpose of allocution to appellant several times and advised him to focus on his life and why his life should be spared. Appellant ignored the court's advice, however, and spent most of his time arguing that counsel had been ineffective. The trial court succinctly responded to appellant's complaints that counsel had not prepared him for the hearing: "What I want to know about doesn't require preparation or briefing."

{¶ 163} Counsel's comment that death for appellant might be merciful was part of a defense strategy to point out that a life sentence would be a worse punishment than a death sentence for this particular defendant. Moreover, counsel concluded by asking the court to impose a life sentence on appellant rather than a death sentence.

{¶ 164} Next, appellant cites instances in which counsel failed to object to statements or matters that we have discussed under other propositions of law: allowing alternates in the deliberation room (proposition No. 16), eliciting hearsay

testimony regarding Lubaina's fear of appellant (No. 3), prosecutorial misconduct (No. 5), improper definition of reasonable doubt (No. 18), other-acts evidence (No. 4), violations of the VCCR (No. 17), leaving it to the jury to determine which guilt-phase evidence was relevant to the penalty phase (No. 14), and testimony that should have prompted a mistrial (No. 8). However, in none of these instances was appellant prejudiced by trial counsel's failure to object. None of the alleged failures to object amounted to deficient performance, either individually or collectively, nor did they affect the outcome of appellant's trial.

{¶ 165} Last, appellant asserts that the cumulative effect of errors and omissions by trial counsel infringed his Sixth Amendment right to effective assistance of counsel. However, appellant received a fair trial, and any error was nonprejudicial. "Such errors cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St.3d at 212, 661 N.E.2d 1068; *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 123. For all the foregoing reasons, we reject appellant's sixth proposition.

## VII. Constitutionality

{¶ 166} In his 19th proposition of law, appellant challenges the constitutionality of Ohio's death-penalty statutes. These claims are summarily rejected. See, e.g., *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, syllabus; *State v. Zuern* (1987), 32 Ohio St.3d 56, 63, 512 N.E.2d 585; *State v. Carter* (1992), 64 Ohio St.3d 218, 227, 594 N.E.2d 595; *State v. Buell* (1986), 22 Ohio St.3d 124, 139, 22 OBR 203, 489 N.E.2d 795; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

## VIII. Independent Review and Proportionality

{¶ 167} After independent assessment, we find that the evidence proves beyond a reasonable doubt the aggravating circumstances in this case: that appellant murdered Lubaina, her father Abdul, her sister Ruhie and Ruhie's daughter, Nasira, as a course of conduct (R.C. 2929.04[A][5] ); and that Nasira was under the age of 13 at the time of her death (R.C. 2929.04[A][9] ).

{¶ 168} At the mitigation hearing, appellant presented four witnesses. The first two were called to show that prior to the murders, appellant was showing signs of paranoia. John Mentzer, the maintenance supervisor of the apartments where appellant lived, testified that appellant "was one of the more difficult residents that I've got on the property." Appellant had complained to Mentzer that maintenance personnel had entered his apartment without his permission. He insisted on seeing Mentzer's records of when apartment personnel had entered his apartment as well as the apartments above and below his. Appellant told Mentzer that "he knew that the CIA had gotten into his apartment and bugged it."

{¶ 169} Lisa Redmond, the apartment manager, also testified for the defense. Redmond testified that appellant had told her that the apartment maintenance personnel had let the CIA into his apartment to bug it. When she denied this, she felt that appellant did not believe her.

{¶ 170} Shehida Ahmed, appellant's sister-in-law, testified on appellant's behalf. Shehida moved to Canada from Pakistan five years earlier and had known appellant for 20 years. According to Shehida, appellant treated all family members well and was very helpful. Appellant had also helped family members financially. Shehida described appellant as having always been religious, practicing Islam, and "devoted towards family." When Lubaina filed for divorce, appellant was very upset, and he tried to convince his relatives to keep their families together and "make their relations better with each other." Shehida always knew appellant as "a loving person."

{¶ 171} Dr. Jeffrey Smalldon, a forensic psychologist, was the principal mitigation witness. Dr. Smalldon observed that "of all of the capital death penalty defendants who I've ever worked with, I believe Mr. Ahmed may have been the most difficult to work with." Smalldon met with appellant three times, spending between 12 and 15 hours with him. Appellant refused to participate in formal testing, and Smalldon found it "all but impossible to engage in a dialog" with him. But Smalldon felt that he had been "able to collect a great deal of relevant information" from appellant without the tests.

{¶ 172} Smalldon found appellant to be "very intelligent" but also paranoid and extremely guarded. Nevertheless, Smalldon was able to obtain useful information on appellant's history and background from appellant and his acquaintances. Appellant grew up in a rural area in Pakistan and attended school, even though education was not compulsory there. His father was a farmer, and his mother was an uneducated housewife. Appellant was one of six children and was the oldest son.

{¶ 173} Appellant served in the Pakistani Air Force, where, in the early 1970s, he became friends with Major Naeem Khan. Appellant maintained contact with Khan until Khan moved to America in the early 1980s. Appellant reestablished contact with Khan when appellant came to the United States in 1987.

{¶ 174} Appellant practices Islam and, according to Smalldon, belongs to the "73rd denomination of Islam," which was in radical disfavor with the mainstream Islamic population in Pakistan in the 1980s. The sect was persecuted, and discriminatory laws were enacted against its members. When appellant emigrated from Pakistan to the United States, he felt he had no other choice. Both appellant and Khan decided to flee Pakistan because of the persecution.

{¶ 175} Upon emigrating from Pakistan, appellant lived in Chicago, where he earned a degree in computer science from Northeastern University. During that

time, he worked for Khan at a refrigeration company. Khan described appellant to Smalldon as quiet, introverted, and very devout but very rigid in his religious beliefs. Khan told Smalldon that appellant was a nonviolent person. In fact, Khan described an incident to Smalldon in which appellant had been beaten up for his religious convictions and had walked away instead of fighting back.

{¶ 176} According to Smalldon's testimony, Khan has remained in contact by telephone with appellant since he has been in jail. Khan told Smalldon, "This is not the Nawaz that I've known. He's living in an illusion." Kahn told Smalldon that he believes that appellant had lost touch with reality and had lost his rationality. Appellant asked Khan in one phone conversation: "Are you on my side or are you on their side?"

{¶ 177} Smalldon noted that appellant had no history of being treated for mental or emotional problems until 1999. Lubaina had prescribed for him the antidepressant Prozac at the beginning of 1999. Appellant's physician in Columbus, Dr. Mohammed Ahmed, met with him briefly in 1999 and prescribed Zoloft for his depression.

{¶ 178} Smalldon concluded that appellant is not insane, but suffers from a delusional disorder, persecutory type; a depressive disorder; and a paranoid personality disorder. In addition, appellant has several prominent personality traits: narcissistic trait—a pattern of grandiosity, presumptuousness, and a sense of entitlement; passive-aggressive trait—a pervasive negativistic attitude, seeing the glass half-empty, and feeling that he is getting "a raw deal"; and obsessive-compulsive trait—a preoccupation with control, order, typically at the expense of flexibility and spontaneity. According to Smalldon, appellant's paranoid-personality disorder is characterized by a pervasive suspicion of other people, a too quick tendency to believe that people are out to humiliate or demean him.

{¶ 179} Smalldon testified that appellant was experiencing delusional disorder of the persecutory type while committing the murders. Smalldon asserted that appellant has a severe mental illness that impaired his capacity to accurately perceive reality and think logically. However, Smalldon declined to state that because of appellant's mental illness, he lacked the capacity to understand the wrongfulness of his conduct. Rather, Smalldon stated that appellant's mental illness was of such severity that it *could* have substantially impaired his ability to conform his conduct to the requirements of law.

{¶ 180} Appellant declined to make an unsworn statement at the mitigation hearing.

{¶ 181} The nature and circumstances of the offense offer nothing in mitigation. Appellant traveled from Columbus to St. Clairsville and murdered his estranged wife, father-in-law, sister-in-law, and niece by fracturing their skulls

and slitting their throats. Appellant then tried to escape to Pakistan before he was apprehended.

{¶ 182} Appellant's history, character, and background provide some mitigating features. He served in the Pakistani Air Force. He earned a degree in computer science when he came to the United States and was gainfully employed during his time here. Appellant is very religious and, in fact, fled Pakistan because of religious persecution.

{¶ 183} With regard to the statutory mitigating factors of R.C. 2929.04(B), the trial court considered appellant's mental illness to be a mental disease or defect under R.C. 2929.04(B)(3). Dr. Smalldon testified that appellant's mental illness could have substantially impaired his ability to conform his conduct to the requirements of law. Although we do not view appellant's mental illness as a (B)(3) factor, it is nevertheless entitled to weight in mitigation as a (B)(7) factor. See *State v. Raglin*, 83 Ohio St.3d at 273, 699 N.E.2d 482.

{¶ 184} The R.C. 2929.04(B)(5) factor also deserves weight in mitigation, since appellant lacked a significant history of prior criminal convictions and juvenile adjudications. None of the other factors of R.C. 2929.04(B) are implicated.

{¶ 185} Upon independent weighing, we find that the aggravating circumstance in each murder count (circumstances, in the case of Nasira) outweighs the mitigating factors beyond a reasonable doubt. While appellant was suffering mental and emotional problems in the midst of a contentious divorce, these factors and other mitigating factors are far outweighed in each instance by the aggravating course-of-conduct circumstance. In the murder of Nasira, the two aggravating circumstances heavily outweigh the mitigation. Appellant's actions merit the capital penalty to which he was sentenced.

{¶ 186} As to each victim, the death penalty is both appropriate and proportionate when compared with capital cases involving the purposeful killing or attempt to kill two or more persons. See *State v. Davie*, 80 Ohio St.3d 311, 686 N.E.2d 245; *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506; and *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1. The death penalty is also appropriate and proportionate when compared to cases involving the murder of a child under the age of 13. See *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221 (six-month-old victim); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185 (six-year-old victim).

{¶ 187} Based on the foregoing, the judgment of the court of common pleas, including the penalty of death, is hereby affirmed.

Judgment affirmed.

Moyer, C.J., F.E. Sweeney, Pfeifer, Lundberg Stratton, O'Connor and O'Donnell, JJ., concur.

_____

Frank Pierce, Belmont County Prosecuting Attorney, and Michael L. Collyer, Special Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, State Public Defender, Kelly L. Culshaw and Pamela Prude–Smithers, Assistant Public Defenders, for appellant.