DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Joseph M. Willard, appeals from his conviction in the Medina County Court of Common Pleas for one count of rape. This Court affirms.
 I. {¶ 2} Appellant was indicted by a grand jury for a single count of rape, a felony of the first degree, in violation of R.C.2907.02(A)(2). He entered a plea of not guilty, and a jury trial was held in the Medina County Court of Common Pleas. The jury convicted Appellant, and the trial court sentenced him to five years in prison. Appellant timely appealed his conviction, asserting three assignments of error.
 II. A. First Assignment of Error
"THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S GUILTY VERDICT, AND APPELLANT'S RAPE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 3} In his first assignment of error, Appellant argues that the evidence is legally insufficient to support his conviction and is also contrary to the manifest weight of the evidence.
 {¶ 4} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. As a matter of appellate review, they involve different means and ends. See id. at 386-89. They also invoke different inquiries with different standards of review. Id.; State v. Smith (1997), 80 Ohio St.3d 89, 113. The difference, in the simplest sense, is that sufficiency tests the burden of production while manifest weight tests the burden of persuasion. Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring).
 {¶ 5} Sufficiency is a question of law. Id. at 386; Smith,80 Ohio St.3d at 113. If the State's evidence was insufficient as a matter of law, then on appeal, a majority of the panel may reverse the trial court. Thompkins, 78 Ohio St.3d at paragraph three of the syllabus, citing Sec. 3(B)(3), Art. IV, Ohio Constitution. Because reversal for insufficiency is effectively an acquittal, retrial is prohibited by double jeopardy. Id. at 387, citing Tibbs v. Florida (1982), 457 U.S. 31, 47. Under this construct, the State has failed its burden of production, and as a matter of due process, the issue should not even have been presented to the jury. Id. at 386; Smith,80 Ohio St.3d at 113.
 {¶ 6} In a sufficiency analysis, an appellate court presumes that the State's evidence is true (i.e., both believable and believed), but questions whether the evidence produced satisfies each of the elements of the crime. See State v. Getsy, (1998),84 Ohio St.3d 180, 193. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, citing Jackson v. Virginia (1979), 443 U.S. 307, 319. This standard requires no exhaustive review of the record, no comparative weighing of competing evidence, and no speculation as to the credibility of any witnesses. Instead, the appellate court "view[s] the evidence in a light most favorable to the prosecution." Id. "[T]he weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 7} Manifest weight is a question of fact. Thompkins,78 Ohio St.3d at 387. If the trial court's judgment was against the manifest weight of the evidence, then an appellate panel may reverse the trial court. Id. In the special case of a jury verdict, however, the panel must be unanimous in order to reverse. Id. at paragraph four of the syllabus, citing Sec.3(B)(3), Art. IV, Ohio Constitution. Because reversal on manifest weight grounds is not a question of law, it is not an acquittal but instead is akin to a deadlocked jury from which retrial is allowed. Id. at 388, citing Tibbs, 457 U.S. at 43. Under this construct, the appellate panel "sits as the `thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony," id., finding that the State has failed its burden of persuasion.
 {¶ 8} In a manifest weight analysis, an appellate court essentially undertakes a three-step, sequential inquiry: (1) whether the State's account was believable based upon the evidence; (2) and if so, whether it was more believable than the defendant's version of the evidence; (3) but if not, whether the State's case was so unbelievable or unpersuasive as to undermine the integrity of the jury's finding of guilt and cause one to question whether justice was done. See Getsy,84 Ohio St.3d at 193. Obviously, "[a] conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." State v. Urbin,148 Ohio App.3d 293, 2002-Ohio-3410, at ¶ 26.
 {¶ 9} In step (1) an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses[,] and * * * resolve[s] conflicts in the evidence." Thompkins, 78 Ohio St.3d at 387. Step (2) "concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Internal quotations and emphasis omitted.) Smith, 80 Ohio St.3d at 113. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis omitted.) Thompkins, 78 Ohio St.3d at 387. And in completing step (2), "[a] court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." Id. at 390 (Cook, J., concurring).
 {¶ 10} However, step (3) dictates that an appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Emphasis added.) Id. at 387. See, also, id at 390 (Cook, J., concurring) (stating that the "special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact"). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. In application, this may be stated as "[a court] will not overturn a judgment based solely on the fact that the jury preferred one version of the testimony over the other." State v. Lee, 158 Ohio App.3d 129, 2004-Ohio-3946, at ¶15. A reversal on manifest weight grounds is reserved for the exceptional case where the evidence presented weighs heavily against the judgment.
 {¶ 11} In sex offense cases, this and other courts have consistently held that the testimony of the victim, if believed, is sufficient to support a conviction, even without further corroboration. State v. Matha (1995), 107 Ohio App.3d 756, 759, citing State v. Lewis (1990), 70 Ohio App.3d 624, 638. SeeState v. Economo (1996), 76 Ohio St.3d 56, syllabus. Thus, the testimony of the victim may be enough, and does not need corroborating evidence.
 {¶ 12} Finally, although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. Thompkins,78 Ohio St.3d at 388. "Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Lee at ¶ 18. Accord Urbin at ¶ 31. In the present case, manifest weight is dispositive.
 {¶ 13} R.C. 2907.02(A)(2) states, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C.2907.01(A) defines "sexual conduct" to include "the insertion, however slight, of any part of the body * * * into the vaginal or anal cavity of another" without privilege to do so.
 {¶ 14} Appellant resided in a condominium in Brunswick, Ohio, along with his mother, Kimberly Hall;[1] Kimberly's boyfriend, Mark Todd; Appellant's girlfriend, Nicole Wenneman; and Appellant's friend, Edward Fienberg. Appellant also had a younger brother, a high school student who resided at a different address with his father. Appellant's brother was friends with L.T., a 14 year old female who attended the same high school as Appellant's brother. L.T. also resided in Brunswick with her mother and her younger sister. Her mother's boyfriend lived across the street from them, and L.T. and her sister regularly went to his house after school if their mother was still at work. L.T. had met Appellant a few times prior to November 2, 2004 and had been to Appellant's house with Appellant's brother and another friend once, a few days prior to that date.
 {¶ 15} The testimony as to the events of November 2, 2004, is somewhat in conflict. L.T. testified that after school that day, she telephoned Appellant, who invited her to his residence to watch a movie with Appellant and his brother. L.T. further testified that Appellant picked her up from her mother's boyfriend's house between 5:00 and 6:00 p.m. in his royal blue Chevrolet Cavalier and took her to Appellant's residence, where nobody else was present. She testified that she and Appellant sat together on the couch for a few minutes, watching "Fear Factor" on television and waiting for Appellant's brother to arrive. While watching television, Appellant pulled L.T. toward him and anally raped her while restraining her arms and her body. She further testified that Appellant stopped and ran upstairs when he heard Mr. Fienberg, Ms. Hall, and Mr. Todd entering the house. When they entered the residence, Ms. Hall talked with L.T. for a few minutes. Appellant came downstairs a few minutes later wearing different clothes, announced that he was going to pick up Ms. Wenneman at her mother's house, and took L.T. back to her house. L.T. testified that she telephoned a friend who lived out of state that evening and told him about the incident. She also testified that she told her brother about the incident the following morning.
 {¶ 16} L.T. testified that on November 5, 2004, Appellant called her on her mother's cell phone while they were at a local shopping mall. The following day, L.T. told her mother that she had been raped. L.T. and her mother filed a police report on November 9, 2004, a week after the incident. Photographs of several bruises on L.T.'s body were taken at the police station, and L.T. testified that she received at least one bruise, and possibly the others, while she was resisting Appellant's advances. She testified that she was examined by a doctor, who found no evidence of rectal injuries. L.T. testified that the underwear she had worn on November 2, 2004 was washed before she reported that she had been raped. A laboratory test on the pants that L.T. wore that day did not reveal DNA evidence that could be linked to Appellant.
 {¶ 17} According to the testimony of L.T.'s younger sister, L.T. told her that she intended to go to Appellant's house during the evening of November 2, 2004 and that she had received permission from the girls' mother. L.T.'s sister also stated that an unknown individual picked L.T. up at their mother's boyfriend's house that evening between 5:00 and 6:00 p.m. in a dark blue car. She testified that L.T. looked depressed and upset when she returned home later that evening.
 {¶ 18} L.T.'s brother testified that he picked L.T. up to take her to school as usual the following morning, but that he came earlier than usual at L.T.'s request. He testified that L.T. told him during the car ride to school that she had been raped by a friend's brother the night before. L.T.'s brother also testified that he told their mother about the rape, but that he did not tell her right away because L.T. told him not to tell anybody.
 {¶ 19} L.T.'s mother, P.T., testified that she had given L.T. permission to go to Appellant's house to watch a movie with Appellant's brother. She testified that L.T. "stormed through the kitchen really quickly" when she returned home between 7:00 and 7:30 p.m., skipped dinner, and spent the entire evening in her bedroom. P.T. testified that L.T. received a call on P.T.'s cell phone on November 5, 2004 while they were at the mall. She stated that L.T. answered the phone and walked away and appeared to be upset when she returned. The following day, L.T. told P.T. that she had been raped, but P.T. did not take her to have a medical examination or to file a police report until November 9, 2004, when P.T. discovered that one of her sons knew of the rape and had had an altercation with Appellant. She testified that L.T. had refused to see a doctor and that she knew there would be no physical evidence five days after a rape.
 {¶ 20} In a written statement to police, Ms. Wenneman stated that she came home from school at 3:00 p.m. and was there all evening. Appellant arrived home at about 5:00 p.m., according to the statement. At trial, however, Ms. Wenneman, who had ended her relationship with Appellant about a month before trial, testified that Appellant had told her to state to the police that she had been at Appellant's home all evening. According to her testimony, she had actually been at her mother's house from the time she got home from school until Appellant picked her up between approximately 5:00 p.m. and 6:30 p.m. Appellant later admitted to Ms. Wenneman that a girl had been at Appellant's house while he was in the shower after work. Ms. Wenneman also testified that Appellant's cellular phone was in her possession all day on November 2, 2004 and that Appellant had no other telephone at his house.
 {¶ 21} Appellant told the investigating police officer that he got home from work at about 5:30 p.m., although his time card from his workplace, which was entered into evidence at trial, showed that he had left work at 3:30 p.m. The police officer also testified from a television schedule, which was entered into evidence, that "Fear Factor" was airing on TV at 6:00 p.m.
 {¶ 22} Mr. Fienberg testified that he left the residence between 8:00 and 9:00 p.m. on November 2, 2004, that he had been home all day until that time. Ms. Hall and Mr. Todd left for a time in the afternoon but were otherwise upstairs in the residence all day. He testified that Ms. Wenneman was with Appellant when Appellant came home from work and that L.T. was not at the residence that day.
 {¶ 23} Ms. Hall testified that she and Mr. Todd left the house to vote between 2:30 and 3:00 p.m. and returned between 4:00 and 4:30 p.m., and that Appellant came home shortly thereafter with Ms. Wenneman. She testified that she had not seen L.T. at the residence that day. In a police report, Ms. Hall stated that her son was at home with her on November 2, 2004 and that he "normally" gets home between 4:30 and 5:30 p.m. She testified that at the time she made the report, she could not remember precisely what time Appellant arrived home on November 2, 2004, although she knew that it was after she returned home.
 {¶ 24} Having reviewed the record and considered Appellant's criticisms of the State's evidence, we do not think the jury clearly lost its way and created a manifest miscarriage of justice in reaching a guilty verdict. It is not difficult to believe that L.T. would wait until a week after the crime to report it to authorities, particularly in light of her testimony that she feared the consequences of accusing somebody of rape. It is also believable that a medical examination conducted a week later would reveal no signs of trauma and no DNA evidence, and that Appellant could have raped L.T. in the manner which she described without leaving physical evidence on her outer clothes.
 {¶ 25} Nor are we convinced that discrepancies involving several witnesses' testimony and corresponding phone records necessarily preclude a guilty verdict. L.T. testified that she called Appellant on November 2, 2004 to make plans to go to Appellant's house, but Ms. Wenneman admitted that she had Appellant's cell phone with her that afternoon and that Appellant had no other phone at his residence. L.T. and P.T. also testified that L.T. received calls from Appellant on the evening of November 5, 2004 but did not place any calls to Appellant, although phone records seem to indicate several outgoing calls from P.T.'s cell phone to Appellant's cell phone that evening. While these discrepancies could have a bearing on the credibility of the State's witnesses, they do not in themselves make the allegations against Appellant so unbelievable as to undermine the integrity of the verdict.
 {¶ 26} The State's witnesses also provided a fair amount of testimony corroborating L.T.'s own testimony, primarily that of her mother and her sister. Based on the evidence in the record, we cannot say that the jury clearly lost its way in finding Appellant guilty. Thus, the verdict was not contrary to the manifest weight of the evidence. Because a finding that a guilty verdict was not contrary to the manifest weight of the evidence necessarily entails a finding that the evidence was legally sufficient to support the conviction, Lee at ¶ 18, Appellant's first assignment of error is overruled.
 B. Second Assignment of Error
"THE TRIAL COURT ABUSED IT[S] DISCRETION AND ERRED TO THE PREJUDICE OF APPELLANT BY ALLOWING THE STATE TO INTRODUCE, OVER OBJECTION, IRRELEVANT AND UNFAIRLY PREJUDICIAL `OTHER ACTS' TESTIMONY CONCERNING THE FACT THAT THE ALLEGED VICTIM SWITCHED SCHOOLS AFTER BEING ASSAULTED BY ANOTHER JUVENILE FEMALE FOLLOWING THE REPORT OF THE ALLEGED RAPE OFFENSE TO THE POLICE."
 {¶ 27} L.T. and P.T. testified that L.T. was harassed at school after reporting the rape to police and that she was on one occasion seriously beaten by Mr. Fienberg's girlfriend in apparent retaliation. Appellant argues that to the extent the trial court admitted this testimony, it was irrelevant evidence of other wrongful acts and prejudicial to Appellant.
 {¶ 28} A trial court's decision to admit evidence is reviewed for abuse of discretion. State v. Ahmed, 103 Ohio St.3d 27,2004-Ohio-4190, at ¶ 79. An abuse of discretion is more than an error of law or judgment, but rather, it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Under this standard of review, an appellate court may not merely substitute its judgment for that of the trial court. Pons v.Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 29} Evid.R. 404(B) does not, in this case, operate to exclude L.T.'s testimony, as Appellant suggests. Evid.R. 404(B) provides, in relevant part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." The staff note to Evid.R. 404(B) further provides, in relevant part, "Evidence of other crimes, wrongs or acts of the accused are not admissible to show that the accused committed the crime with which he is now charged." (Emphasis added.) It is clear that Evid.R. 404(B) only requires a court to exclude evidence of adefendant's past acts in order to show that the defendant has a propensity for committing the acts at issue before the court. The rule is inapplicable here. L.T. and P.T. did not testify as to Appellant's past acts at all, and their testimony as to the acts of Mr. Fienberg's girlfriend were not to show any propensity on Appellant's part to commit the crime in question, i.e. rape.
 {¶ 30} In State v. Rose (Mar. 3, 1976), 7th Dist. No. 75 C.A. 61, a trial judge admitted testimony from a prosecution witness to the effect that the witness had received two threatening phone calls within a day of going to a police lineup to identify the perpetrator of a crime. The appellate court held that the testimony was admissible to explain why the witness failed to identify the defendant in the lineup, even though it was not the defendant who placed the calls. Id. at *3.
 {¶ 31} Likewise, in this case, we believe that the evidence of intimidation and violence was relevant to show that L.T. faced a real and very strong possibility of danger and harassment from reporting that she was raped, and therefore had reason to fear filing a police report. Such testimony was all the more relevant considering Appellant's subsequent cross-examination of L.T., her mother, and her brother on the issue of her delay in reporting the rape. We hold that the trial court did not abuse its discretion in determining that the testimony was relevant and not unduly prejudicial. Appellant's second assignment of error is overruled.
 C. Third Assignment of Error
"APPELLANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHERE: (1) COUNSEL DID NOT CALL THE PHYSICIAN WHO EXAMINED THE ALLEGED VICTIM TO TESTIFY THAT THERE WAS NO PHYSICAL EVIDENCE OF ANAL PENETRATION OR TRAUMA; (2) COUNSEL DID NOT OBJECT TO IRRELEVANT AND HIGHLY PREJUDICIAL `OTHER ACTS' TESTIMONY THAT THE ALLEGED VICTIM WAS HARASSED AT SCHOOL AND ASSAULTED BY ANOTHER JUVENILE FEMALE AFTER REPORTING THE ALLEGED RAPE OFFENSE TO THE POLICE."
 {¶ 32} In his third assignment of error, Appellant contends that he received ineffective assistance of counsel because his trial attorney failed to call as a witness the doctor who examined L.T. and failed to object to the introduction of evidence that L.T. was harassed and assaulted prior to trial.
 {¶ 33} The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. McMann v. Richardson (1970), 397 U.S. 759, 771. Courts employ a two-step process to determine whether the right to effective assistance of counsel has been violated:
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984),466 U.S. 668, 687.
An attorney properly licensed in Ohio is presumed competent.State v. Lott (1990), 51 Ohio St.3d 160, 174. The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was adequate or that counsel's action might be sound trial strategy. State v. Smith (1985),17 Ohio St.3d 98, 100. "Ultimately, the reviewing court must decide whether, in light of all the circumstances, the challenged act or omission fell outside the wide range of professionally competent assistance." State v. DeNardis (Dec. 29, 1993), 9th Dist. No. 2245, at *5, citing Strickland, 466 U.S. at 690.
 {¶ 34} In demonstrating prejudice, the defendant must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
1. Failure to call the physician as a witness
 {¶ 35} Appellant first contends that his trial counsel should have called as a witness L.T.'s physician, who examined her after she reported the rape. Appellant argues that if his trial counsel had questioned the physician about the outcome of the medical examination, which showed no physical evidence of rape, the testimony "could have created reasonable doubt in the minds of the jurors that the charged rape offense took place at all."
 {¶ 36} "`[D]ecisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics' and absent a showing of prejudice, the failure to call witnesses will not be deemed erroneous." State v. Asburay, 9th Dist. No. 01CA0061, 2002-Ohio-2655, at ¶ 22, quoting State v. Coulter
(1992), 75 Ohio App.3d 219, 230. Appellant has not shown that his trial counsel's failure to call L.T.'s doctor as a witness was anything other than a tactical decision or that it fell outside the range of competent representation. Nor has Appellant shown that he was prejudiced by the failure to call the doctor to testify. Even if the doctor had testified, such testimony would not necessarily have helped Appellant's case. L.T. herself testified that the doctor's examination, conducted a week after the rape, showed no evidence as to whether or not she was raped. In other words, based on the physical examination, there may or may not have been evidence to support L.T.'s claim that she was raped. If this had been the doctor's testimony as well, it would not have given the jury any new information that would have strengthened Appellant's case. At best, the evidence would be neutral.
 {¶ 37} Appellant cites State v. Henderson, 11th Dist. No. 2001-T-0047, 2002-Ohio-6715, as a case where the failure to call a physician in a rape case to testify as to the absence of physical evidence constituted ineffective assistance of counsel. From the facts of Henderson, however, it appears that no evidence whatsoever was offered at trial to show the absence of physical evidence. Id. at ¶ 19. In the present case, by contrast, L.T. herself testified that the examination revealed no physical evidence. The jury was made aware of this significant fact, unlike the Henderson jury, and was able to consider it even without the doctor's testimony. The third assignment of error is overruled as to the trial counsel's failure to call the doctor as a witness.
2. Failure to object to other acts testimony
 {¶ 38} Having already concluded in the second assignment of error that the testimony as to the incidents of harassment and the assault committed against L.T. was admissible, this issue is moot and we decline to address it. See App.R. 12(A)(1)(c).
 III. {¶ 39} Appellant's three assignments of error are overruled. Appellant's conviction in the Medina County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J., Carr, J., concur.
[1] Ms. Hall's divorce was finalized between the date of the alleged incident and the date of trial. On November 2, 2004, her name was Kimberly Willard.