[Cite as *In re D.S.*, 2015-Ohio-4548.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| D.S.,<br>DEPENDENT CHILD | : | |
| | : | **CASE NOS. 2015-T-0062<br>and 2015-T-0063** |

Civil Appeals from the Trumbull County Court of Common Pleas, Juvenile Division, Case No. 2011 CH 00093.

Judgment: Affirmed.

*Susan Porter Collins*, Trumbull County Children Services Agency, 2282 Reeves Road, N.E., Warren, OH 44483 (For Plaintiff-Appellee, Trumbull County Children Services Board).

*John H. Chaney, III*, Daniel Daniluk, L.L.C., 1129 Niles-Cortland Road, S.E., Warren, OH 44484 (For Defendant-Appellant, Donald Sims, Sr.).

*Gregory J. Wysin*, 2037 Brady Lake Road, Kent, OH 44240 (For Defendant-Appellant, Lameka Hunt McClusky).

*Giustina Chinchic*, Law Office of Mark Finamore, 285 Seneca Avenue, N.E., Warren, OH 44481 (Guardian ad litem).

THOMAS R. WRIGHT, J.

{¶1} Appellants, Lameka Hunt McCluskey "mother" and Donald Sims, Sr. "father," are the biological parents of D.S. Mother and father separately appeal the

decision of the Trumbull County Court of Common Pleas, Juvenile Division, that permanently terminates their parental rights with respect to their son, D.S., and awards his permanent custody to the Trumbull County Children Services Board ("TCCSB" or "the agency") for adoption planning and placement under R.C. 2151.414. We consolidated their appeals. Appellants argue that the trial court's decision was against the manifest weight of the evidence; that the TCCSB did not engage in reasonable case planning efforts or attempt to remedy mother's problems that led to D.S.'s displacement; and that the trial court erred in not granting father's motion to continue the custody hearing. For the following reasons, we affirm the decision of the juvenile court.

{¶2} On December 19, 2011 at approximately 10 p.m., the Warren City Police Department removed five-year-old D.S. from the home of his paternal grandmother. D.S. had been in the care and custody of his grandmother pursuant to a power of attorney because his father was incarcerated since 2008 and his mother lived in Georgia. Someone had notified the agency that D.S.'s grandmother had drug issues. She consented to testing and tested positive for cocaine.

{¶3} Accordingly, the agency filed a complaint requesting temporary custody of D.S., born August 21, 2006, or temporary custody to another appropriate person. The agency likewise filed an emergency ex parte motion for temporary custody pending the disposition of its complaint. D.S. was placed in emergency temporary custody on December 20, 2011.

{¶4} The trial court ordered TCCSB to initiate a home study request of the mother's home in Georgia pursuant to the Interstate Compact for the Placement of Children "ICPC." She subsequently moved the court to return legal custody of D.S. to

2

her or to place him in her care. The trial court adjudicated D.S. a dependent child and placed him in the temporary custody of TCCSB on February 17, 2012. During this period, mother exercised weekly telephone visits with D.S. The phone visits were temporarily suspended for two months as a result of her failure to follow the rules and as a result of her threats toward TCCSB staff.

{¶5} Father was released from prison in August of 2012. His case plan was modified and he had weekly visits with D.S.

{¶6} The agency moved for permanent custody of D.S. on April 1, 2013, which was subsequently dismissed in light of father's efforts toward reunification. The court extended the agency's temporary custody for six months and set the permanent custody trial in June 2013. Although Georgia had received TCCSB's second request for placement of D.S. in Georgia, the TCCSB still never received an approval or denial of mother's home for placement.

{¶7} On October 17, 2013, the trial court granted mother and father's motions to continue the permanent custody hearing in order to allow them both to complete their respective case plans. Mother was still residing in Georgia at the time and was visiting with D.S. via weekly telephone calls. The court explained that it was still awaiting affirmation from the State of Georgia relative to its request for its approval of the mother's home in Georgia before it could send D.S. to Georgia to live with her. Father was present at the hearing and acknowledged what was required of him in order to satisfy his son's desire to be returned to him:

{¶8} "THE COURT:  * * * you've signed, you've agreed – are you going to make this happen for little [D.S.]?  * * *

**{¶9}** "[FATHER]: Yes, sir.

**{¶10}** "THE COURT: Do you understand the consequences if you miss one of these [case plan requirements]?

**{¶11}** "* * *

**{¶12}** "THE COURT: What's the consequences?

**{¶13}** "[Father]: I can lose my son."

**{¶14}** As of the December 3, 2013 hearing, the court noted that neither parent was a viable option for placing D.S. Georgia had not approved mother's home for placement, and father's home failed to satisfy the minimum standards. The agency renewed its motion for permanent custody of D.S. in September 2013. Mother subsequently relocated to Trumbull County, Ohio with her two other sons. TCCSB created an amended case plan in response to her relocation.

**{¶15}** D.S. was the subject of an in camera interview on January 30, 2014 during which it was explained to him that adoption was final and meant that he would not be able to ever live with either his mom or dad again. Upon being asked if he wanted to be adopted, he replied no. D.S. was also repeatedly asked if he would rather live with his mom or his dad. He consistently answered that he wanted to live with his mom *and* dad.

**{¶16}** The trial on the agency's motion for termination of parental rights was conducted on March 24, 2014, March 27, 2014, March 28, 2014, April 2, 2014, and concluded on May 21, 2014. The following testimony was presented.

**{¶17}** Carmella Hill testified for the agency. Hill is employed by Coleman Behavioral Health as an Independently Licensed Professional Counselor and acts as

4

the director of behavioral health for Coleman. Hill assessed D.S.'s mother in January of 2014 to determine what services, if any, she needed. Mother had recently moved back to Ohio and wanted to secure housing, to continue her medication regimen, and get her children returned to her. Mother had previously suffered and was treated for dysthymic disorder, and Hill diagnosed her with depression. At the time of her assessment, mother was homeless and living at a mission. Hill recommended counseling and psychiatric services. Mother thereafter followed Hill's recommendations and saw a counselor, psychiatrist, and a nurse practitioner.

{¶18} Jennifer Sheridan also testified for the agency. She is the collection supervisor for Scotchie & Associates where she conducts and oversees drug screens. She attempted to screen father on four separate occasions. Once he tested positive for marijuana and on the other three occasions, he refused to consent to the screening.

{¶19} Sheridan explained that they screened mother three times and she tested negative two of the three times and positive once for Percocet, which had been prescribed to her. On another occasion, mother was unable to provide enough of a specimen to be tested, and mother signed an admission regarding the use of THC on January 28, 2014.

{¶20} Sonya Thompkins, an outpatient therapist at Valley Counseling, also testified for the agency. She is a licensed, clinical counsel who primarily works with children in foster care. She counseled D.S. since October 2013. She describes D.S. as a funny and loveable boy who is very detached during therapy sessions. He does not want to discuss his foster care or his emotions. Thompkins believes that D.S. had not

5

fully grasped his situation, explaining that he "is holding on and holding out for getting back home" with his mom and dad.

{¶21} During the first day of trial, March 24, 2014, D.S.'s father was detained by the Trumbull County Sheriff's Department in response to a federal warrant for his arrest. The next day of trial convened and father's counsel indicated that father was picked up on a probation violation. As a result, counsel moved the court to continue the duration of the trial. The trial court denied the motion suggesting that father participate telephonically. This never occurred. Father was still incarcerated two months later on the final day of trial.

{¶22} Erica Beil, a substitute care caseworker from the Trumbull County Children Services, testified. Beil has been D.S.'s caseworker since he entered foster care more than two years before her testimony. She explained that the agency obtained custody of D.S. after it was reported that his grandmother was abusing crack while he was in her care. She tested positive, and D.S. and his cousins were removed by the Warren City Police. He was adjudicated a dependent in January 2012 and has been in agency custody since that time.

{¶23} Beil confirmed that case plans were developed for each parent, but that neither successfully completed their plans. She confirmed that the father has not secured stable, independent housing; that he never verified sufficient income to support D.S.; and that he has not consistently visited D.S.

{¶24} Beil confirmed that father was in federal custody for eight months and that upon his release in August 2012 through the date of her testimony, March 2014, that father attended a little more than half of his weekly scheduled visits with D.S. Father did

6

not visit D.S. at all in February or March of 2014, and he visited with D.S. twice in January of 2014. At one of the January visits father appeared impaired and was asked to submit to a drug screening. He refused and became combative. At another January visit, father refused to submit to a drug screening and then left without visiting.

{¶25} Beil testified that father was to pay $50 per month in child support since December 2012, but has paid nothing. She likewise confirmed that father previously had his parental rights terminated regarding his child with another woman based on his abandonment of that child. However, Beil admitted on cross-examination that the reasons for the removal of that child were all directly related to the mother's actions and that there was no way to confirm whether father had notice of those proceedings since he apparently lived in Columbus at the time.

{¶26} Beil testified that father's lack of contact and failure to complete his case plan display his lack of commitment to D.S. She confirmed that father was not home for his scheduled home inspection and that he no longer maintains that address as his residence. When father did finally meet Beil for the postponed home inspection, the home did not satisfy the issues previously identified as lacking.

{¶27} Beil also confirmed that mother never participated or completed the interstate home study, which was sent to Georgia twice. Mother then moved to Ohio with her other two children who are now likewise in the custody of the agency. Mother's other children had twice been in agency custody.

{¶28} Upon mother's relocation to Ohio, she stayed at the father's house for a few days with her other two children before moving to a shelter. Mother's visits with D.S. have been consistent since her move to Ohio. Her telephone visits during her

7

Georgia residency were interrupted for two months when they were suspended as a result of mother's "grilling" D.S. on the phone and requests for him to relay messages to father. Beil described D.S. as having "an incredibly difficult time remaining focused" during these telephone visits.

{¶29} Upon her return to Ohio, mother and D.S. had weekly, one-hour visits supervised by camera, but the supervision was escalated when she broke the agency's visitation rules. The same day she was given the rules, she violated them by whispering to D.S. and discussing his father with him. Mother repeatedly told D.S. about visits with his father that were not scheduled and that never occurred, which would upset him. Mother also asked repetitive questions of D.S., told him how to act, and demanded hugs and kisses. At times, D.S. would run from mother, and she would chase him around the room. Mother was likewise disrespectful to the agency staff, including Beil, and one of the visits had to end early which resulted in mother refusing to allow D.S. to leave. Mother has likewise failed to pay any of her child support payments.

{¶30} D.S. had been in the agency's custody for two years before the March 2014 permanent custody trial. Before that, he had been in the care of his father and/or grandmother. D.S. had not lived with his mother for three years when he came into the agency's care.

{¶31} Beil confirmed that D.S. has a very loving relationship with his father and that they interact in an appropriate manner. She described them as having a strong bond. She explained that D.S. was very upset when his father did not appear for his scheduled visits. Although father told Beil he had been working, she asked for a

8

release to secure his employment records, but father never executed it. She confirmed on cross-examination that the recent decline in father's visits could be a result of father's frustrations with the process. Beil agreed that father's inability to afford appropriate housing and utilities has been an issue. She also agreed that D.S. was taken while father was in prison and that D.S.'s removal did not directly stem from any actions by father. Father contacted her upon his release from prison in an effort to get D.S. returned to him.

{¶32} Beil also noted that father does not have his license to drive an automobile and that he uses a bicycle for transportation. Father planned to use his own father for emergency transportation for D.S. to comply with his case plan. Father assisted Beil in securing his psychological evaluation. Father complied with some of the case plan requirements, but was still unable to maintain employment, pay child support, and secure independent housing.

{¶33} As for D.S.'s relationship with his mother, Beil describes him as "hard pressed by Mom to reciprocate her affections. I've witnessed many occasion where Mom is overly affectionate * * * where [D.S.] is squirming to get away." Beil explained that D.S. does not get excited for visits with his mother and he is not upset when they are over. Beil explained that D.S. was excited to visit with his half siblings, but then they did not get along well and would argue. D.S. has not lived with his mother since he was two years old. Mother's counsel claims that father had hid D.S.'s location from her, but there was no evidence presented on this issue.

{¶34} Beil confirmed on cross-examination that mother relocated to Ohio in January of 2014. Beil also confirmed that the failure in securing mother's home study in

9

Georgia was a result of failures at the county level and not based on mother's willingness to cooperate. She agreed that mother was "frantic about the process * * *." Beil agreed that mother has made "considerable effort to try to reconnect with her child and develop that bond[.]" Mother brought him clothing and an electric scooter at Christmas. Beil confirmed that mother asked for photos of her and D.S. every time she visited with him. She made an unannounced visit to mother's home one week before the trial and that based on her cursory review of mother's home, it appeared appropriate. Mother's income in Georgia was via social security in some form. Beil has not attempted to confirm whether mother has a stable income since her relocation to Ohio. At the time of her visit to mother's home, Beil likewise did not attempt to determine if mother had complied with her newest case plan.

{¶35} No other relatives have come forward and offered to care for D.S. Beil believes that D.S. is an adoptable child, and she recommends that permanent custody be granted to the agency. She explained that to her an adoptable child determination includes the fact that D.S. functions well in a family setting and whether she believes a family would "come forward" for him. Beil believes that D.S. can bond to an adoptive family and that he is generally a very friendly, open, and giving child.

{¶36} On cross-examination, Beil agreed that there was not an issue concerning father and drug testing until the latest motion for permanent custody by the agency. She also agreed that father consistently "had a roof over his head" since his release from prison, but the accommodations were consistently too small and did not meet specific requirements for D.S.'s placement. Father had a difficult time securing a suitable residence based on his felony background. Beil confirmed that the agency

10

even wrote letters to the local Metropolitan Housing Authority in an effort to help father secure a suitable living space for D.S.

{¶37} At the time of the custody hearing, father was again incarcerated and mother had two other children in foster care in addition to D.S. D.S. had been in the agency's care for more than two years. Father had previously been released from prison in August of 2012, but was still not in a position to take care of D.S. a year later in August 2013.

{¶38} Dr. David Chiarella, a pediatric and adolescent psychologist, also testified and explained the reasoning ability of a typical seven-year-old. He stated that although a seven-year-old can state his preference regarding custody and visitation issues, he does not believe that a seven-year-old "has the necessary reasoning ability in order to understand particularly the potential risks and benefits of those decisions, [or] the potential consequences of those decisions."

{¶39} Becky Peters, visitation coordinator and licensed social worker at TCCSB, also testified. She has supervised and monitored some of D.S.'s visits with his parents. She described D.S.'s visits with his father as usually calm and affectionate, but on one occasion, father was agitated and short with D.S. She watched him throw a big, bouncy ball at D.S.'s head in a "mean way." Peters then entered the room to watch the visit, and D.S. and father were coloring. D.S. asked his dad to hang his drawing on his refrigerator and father told him no because he had too much "junk" on it. Peters confirmed that father's visits had become less consistent and that father had not visited with D.S. at all in February or March of 2014. She described D.S. as very sad and upset when his father missed a scheduled visit.

11

{¶40} Peters explained that mother always came to her visits and was always very affectionate. She brought D.S. snacks and gifts, and she was interested in his school work. She described D.S. as becoming "limp" in response to his mother's affections. D.S. is more relaxed during his visits with father; whereas he is hyper and aggressive during mother's visits. Peters agreed that his mother has made every effort possible to let D.S. know that she is his mother and that she loves him. However, Peters also had to speak with mother about violating agency rules. Mother often whispered during visitation and talked about D.S.'s father, which was upsetting. Mother also asked D.S. to have a foster parent meet her somewhere for a visit, which was inappropriate. At another visit, mother made a threat toward D.S.'s foster parents, which resulted in the agency ending the visit and calling the police.

{¶41} Trudy Seymour, supervisor of substitute care at TCCSB, testified that she oversaw D.S.'s case plan progress and visitation. Seymour likewise communicated with parents and counsel regarding D.S.'s case. She oversaw mother's phone visitation with D.S. while she lived in Georgia. Mother only missed one phone appointment and she often included D.S.'s siblings in the calls. Seymour explained that mother would tend to talk about when D.S. would return home and ask D.S. to relay messages to his father, which were against agency rules. The State of Georgia never sent the agency an approval regarding interstate placement of D.S. in mother's Georgia home. D.S. was in the agency's care for 24 months at the time of the hearing, and mother lived in Georgia for 20 of those 24 months.

{¶42} Upon mother's return to Ohio, Seymour was involved with her in-person visits. On one occasion, mother was advised not to discuss father, but she almost

12

immediately told D.S. that she was staying with his father and that they wanted him to come home and be a family. Mother also waited in her car to waive goodbye when D.S. left with his foster family, which was a safety issue. On another occasion, Seymour said she had to call the police, but no further details were provided as to why the police were contacted.

{¶43} Seymour provided mother contact information for the local housing authority upon her return to Ohio. She also confirmed that mother's two other children were in agency care at the time of D.S.'s hearing. Seymour agreed on cross-examination that the agency had already moved for permanent custody before mother relocated to Ohio, indicating that D.S. had been in its "care too long and the Agency had to move forward with best interest and go to permanent custody."

{¶44} Mother testified, but on cross-examination only. She confirmed that she is married and her husband is incarcerated in Georgia. She said they plan on moving to Columbus, Ohio upon his release. She has three children including D.S., who has not lived with her since he was two. She confirmed that another of her children was in the care of children services in Franklin County, Ohio and again in Georgia. Both of her other sons are currently in foster care "by her choice." She explained that she was never approved for the interstate placement of D.S. since she could not afford to pay for the $1,500 psychological evaluation. So, she moved to Ohio in an effort to get D.S. back.

{¶45} Upon her return and while staying at a shelter for abused women and children, mother claims that the staff there caused one of her sons to suffer asthma attacks by making loud noises while he was sleeping. She called for emergency

13

medical transportation to the hospital to check her son's asthma and her blood pressure. Mother takes Prozac and Vistaril to treat her depression and she was taking both at the time. She explained that she voluntarily placed her other two sons in foster care until she is able to secure safe housing for them.

{¶46} D.S.'s guardian ad litem, Tina Chinchic, gave her report at the hearing and explained that she has been overseeing his best interests since December 2011. D.S. expressed his desire to live with his father early on. Because his best interests conflicted with his desires, she secured an attorney to represent him. The GAL unequivocally concluded that D.S. was in need of permanency and that after 28 months of agency custody, he needs stability and a "solid game plan for a home and a life." She explained how D.S. had thrived with his first foster family and that both of his parents have issues and cannot provide the stability that he needs. She recommended that D.S. be permanently placed with the agency to be adopted because that is in his best interest. The GAL also believes that the agency has made "reasonable efforts by submitting two interstate compacts" to Georgia; that the agency made "reasonable efforts" toward assisting the father by providing counseling, evaluations, and transportation services; and that the agency generally made reasonable efforts to reunify the family.

{¶47} Seymour was called as a rebuttal witness. She confirmed that mother completed ten parenting classes during the intermission between trial dates from April 2, 2014 to May 21, 2014. However, the report recommended additional parenting classes. Mother also attended outpatient counseling during this time and continued to

14

visit D.S. regularly during this time. However, Seymour explained that mother still had not complied with the agency's visitation rules.

{¶48} The magistrate subsequently issued a ten-page decision on June 4, 2014 that permanently terminated mother and father's parental rights with respect to D.S. The decision addressed each best interest factor and found that clear and convincing evidence warranted that the permanent custody of D.S. be awarded to TCCSB. Both parents and D.S. filed objections.

{¶49} Notwithstanding the magistrate's decision and pending objections, the trial court authorized both mother and father an additional opportunity to submit suitable home studies. Both failed to do so. The trial court set forth the following in its February 25, 2015 pretrial order:

{¶50} "A pretrial was held this past month to see if there were any new placement opportunities for either parent. Nothing new was offered at the pretrial, and the court concludes that Father remains in the care of federal authorities and Mother is in a shelter. The Court was informed that the father will 'soon' be released from federal control and have [sic] a home for himself and [D.S.] Both parents are physically in Franklin County, Ohio. Neither can immediately take [D.S.] * * * [A]nd in order to achieve permanency, the agency * * * must continue to have custody of [D.S.] and the Father [is] granted until May 11, 2015, at 9 AM to file * * * a Franklin County Homestudy approving him, his home and those who reside with him, for placement of [D.S.] Upon failure to do so, the Decision [of the magistrate] will be approved."

{¶51} Father never complied with this additional opportunity to establish that he could afford D.S. a suitable home. Thus, on May 11, 2015, the trial court overruled all

15

objections, granted permanent custody of D.S. to the agency, and terminated appellants' parental rights. Mother and father timely filed their instant appeals.

**{¶52}** Mother asserts two assigned errors for our review:

**{¶53}** "The trial court committed reversible error when it found that TCCSB made reasonable efforts to eliminate the continued removal of D.S. from his home or make it possible to return into his mother's legal custody when TCCSB made no request for a bypass of the requirements of 2151.419(A), and none was granted.

**{¶54}** "The trial court committed reversible error when it found, against the manifest weight of the evidence presented at trial that permanent custody was in the best interest of D.S., and that TCCSB engaged in reasonable case planning and diligent efforts to assist Ms. McCluskey to remedy the problems that initially caused D.S. to be placed outside of her home pursuant to R.C. 2151.414(E)(1)."

**{¶55}** Father asserts two assignments of error on appeal:

**{¶56}** "The trial court erred by refusing to grant Father's motion for continuance of the custody hearing, where the Court was specifically advised regarding the reason for Father's absence, and Father had appeared at the previous custody hearing, had been actively involved in the case, and had outlined his intention to testify at the custody hearing.

**{¶57}** "The trial court erred in granting TCCSB's motion for permanent custody and terminating Father's parental rights, where TCCSB failed to establish that permanent custody was in the best interest of the minor child, D.S. (D.O.B. 08/21/2006)."

16

{¶58} Mother first claims that the trial court committed reversible error in finding that the agency met its burden and made reasonable efforts to reunify D.S. with her. The agency disagrees explaining that it previously put forth the requisite, reasonable efforts to reunify D.S. with his mother, but that it did not have to make further, reasonable efforts to reunify once it filed its motion for permanent custody pursuant to R.C. 2151.419(A)(1).

{¶59} "When the state intervenes to protect a child's health or safety, '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are called "reasonable efforts."'" (Citation omitted.) *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816 ¶29. Various sections of the Revised Code set forth an agency's duty to make reasonable efforts; the concept is not encompassed in a single section. *Id.*

{¶60} However, the statutory requirement that a court determine whether an agency has made reasonable efforts to return a child to the parents' home does not apply in a permanent custody proceeding. *Id* at ¶41-42. Instead, the "reasonable efforts" requirement applies at other, earlier stages of the proceeding. *Id*.

{¶61} "R.C. 2151.419 *does not apply* in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413 and R.C. 2151.414. * * * [T]his does not mean that the agency is relieved of the duty to make reasonable efforts." (Emphasis added.) *In re J.F.F.*, 5th Dist. Stark No. 2009-CA-00133, 2009-Ohio-4736, at ¶24, citing *In re C.F.* at ¶42. Instead, "'the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification.'" *Id*. However, "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a

motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.*, supra.

**{¶62}** In the instant case, the trial court found that the agency made reasonable efforts to safely return D.S. to his parents on several occasions. On April 9, 2013, the magistrate's decision notes that reasonable efforts were made by the agency to make it possible for D.S. to return home safely. The agency's efforts included, but were not limited to, providing crisis intervention, assessment services, placement services, home evaluations, relative search, and referrals to community resources. This decision likewise notes that the agency's interstate compact home evaluation was pending regarding the mother's home in Georgia.

**{¶63}** The magistrate's November 5, 2012 decision made similar findings, including that reasonable efforts were made by TCCSB to secure home evaluations, drug screenings, casework counseling and management, and others in order to make it possible for D.S. to return home safely. This decision also notes that Georgia denied the agency's first interstate home study request since mother's other two children were temporarily in foster care in Georgia.

**{¶64}** The magistrate's March 15, 2012 decision likewise finds that the agency made reasonable efforts to return D.S. safely home by providing services including, but not limited to, placement services, home evaluations, investigative and assessment services, and others. Both mother and father were appointed counsel on this date, and the GAL was appointed as well. As TCCSB points out, there were no objections filed in response to these "reasonable efforts" findings.

**{¶65}** Thus, contrary to mother's claims, the trial court made "reasonable effort" findings on at least three prior occasions. Further, the magistrate delineated these reasonable efforts in his June 4, 2014 decision, noting that the reasonable efforts have been exhausted and neither mother nor father is able to receive custody of D.S. Furthermore, the evidence reflects that the agency exerted reasonable efforts and provided services designed to aid both mother and father to remedy their issues in an effort to return D.S. to them.

**{¶66}** Encompassed in mother's first assigned error is her concern that although the agency developed a later case plan in January of 2014 with a goal of reunification upon her relocation to Ohio, it did not exert reasonable efforts to implement this subsequent plan. She claims that although the agency drafted the plan, it had no intention of fulfilling it and instead focused its efforts on securing D.S.'s permanent custody with the agency. However, the record reveals that the agency continued to facilitate mother's visits with D.S., continued providing mother the requisite assessments, parenting classes, and other reasonable efforts required of it. Notwithstanding, and in spite of the agency's continued efforts, D.S.'s siblings were still in foster care at the time of the permanent custody trial, and she did not have an approved placement for D.S.

**{¶67}** Accordingly, mother's first assigned error lacks merit and is overruled.

**{¶68}** Next both mother and father take issue with the trial court's finding that permanent custody was in the best interest of D.S. Both raise this alleged error as their second assigned errors.

**{¶69}** Parents have a constitutionally protected and fundamental right in the care, custody, and management of their children. *In re H.D.*, 10th Dist. Franklin No. 13AP-707, 2014-Ohio-228, ¶10; *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). However, these rights are not unconditional and are subordinate to the best interest of the child when considering a motion to terminate parental rights. *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). Thus, in certain circumstances, the state may terminate one's parental rights when doing so is in the best interest of the child. *Id.* at 105.

**{¶70}** R.C. 2151.413(D)(1) requires an agency with custody of a child for twelve or more of the prior, consecutive 22 months to file a motion requesting permanent custody of the child, unless it is not in the best interest of the child, or if the agency has not made reasonable efforts under R.C. 2151.419 as detailed in the parent's case plan.

**{¶71}** R.C. 2151.414 sets forth a two-part test governing whether to award permanent custody to a public services agency. *In re J.S.*, 8th Dist. Cuyahoga Nos. 101991 and 101992, 2015-Ohio-2701, ¶47. First, after a hearing, the court must find by clear and convincing evidence that granting permanent custody of the child to the agency is in the best interest of the child upon considering all relevant factors including those in R.C. 2151.414(D). Clear and convincing evidence is evidence sufficient to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985). The clear and convincing standard does not require clear and unequivocal evidence. *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, a reviewing

20

court must examine the record and determine whether the trier of fact had sufficient evidence before it to satisfy this burden of proof. *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). The credibility of witnesses and weight of the evidence are primarily issues for the trial court, as the trier of fact. *In re Ohler*, 4th Dist. Hocking No. 04CA8, 2005-Ohio-1583, ¶15.

**{¶72}** Second, a court must make one of the findings delineated in R.C. 2151.414(B)(1)(a)-(e). *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶10. In practice, however, courts usually make the second finding first before embarking on the best interest analysis. *In re N.T.,* 11th Dist. Ashtabula No. 2010-A-0053, 2011-Ohio-650, ¶57. In the instant case, the trial court found that D.S. had been in the agency's care for the past 22 consecutive months, consistent with R.C. 2151.414(B)(1)(d). This finding is undisputed.

**{¶73}** The best interest determination focuses on the child, not the parent. *In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, *17-18 (July 27, 2000), citing *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). While a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a permanent custody determination, "'no one factor is given greater weight than the others pursuant to the statute.'" *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶23, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶56. And only one of the enumerated factors needs to be resolved in favor of an award of permanent custody to the agency for the trial court to terminate parental rights. *In re J.S.*, 2015-Ohio-2701, at ¶51 citing *In re Z.T.,* 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶56.

**{¶74}** The best interest factors are spelled out in R.C. 2151.414(D)(1), which states in part:

**{¶75}** "In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

**{¶76}** "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

**{¶77}** "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

**{¶78}** "(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

**{¶79}** "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

**{¶80}** "(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

**{¶81}** The relevant factors from (E)(7) to (11) include whether the parents have had their parental rights involuntarily terminated with respect to a sibling of the child in issue.

**{¶82}** In this case, several factors weigh in favor of awarding permanent custody of D.S. to TCCSB. In overruling objections to the magistrate's decision, the trial court concluded that in spite of the agency's efforts, D.S. had been in its care for more than three years and that as of June 4, 2014 "the parents had no placement available" for D.S. It also noted that a subsequent pretrial was held after the trial to see "if there were any new placement opportunities with either parent. Nothing new was offered at the pretrial * * *. He is too young to store in foster care. * * * He needs permanency. * * * He is too young to not have a home and family."

**{¶83}** Upon reviewing the record in this case, the trial court had clear and convincing evidence before it to conclude that it was in D.S.'s best interest to be placed in permanent custody of TCCSB. D.S. was able to thrive in his stable foster care environment, but neither his mother nor his father can provide him stability. D.S. has also demonstrated his ability to strongly bond with his first foster parent.

**{¶84}** Although D.S. expressed a strong desire to live with his father, and the two showed a substantial bond to one another, father's repeated incarceration and bad decision making has left D.S. without the structured and safe environment he needs. Father has not been able to provide a legally secure and permanent placement for D.S. At the time of the magistrate's decision, D.S. had been in the agency's care or in foster

care for 31 months. Further, father previously lost permanent custody of another child to TCCSB.

**{¶85}** Father places great emphasis on the fact that he was not the reason for D.S.'s initial placement in the agency's care and custody. While his acts did not directly cause the police to be called and result in D.S.'s placement with the agency, father's poor decision making did result in his incarceration, which did directly prevent him from affording D.S. the permanent and safe living environment that he needs.

**{¶86}** And although mother has exerted recent efforts in an attempt to secure D.S.'s placement with her, including relocating to Ohio, she likewise has been unable to provide a secure and permanent placement for D.S. At the time of the custody hearing, mother's two other children were in foster care, and they had previously been in foster care in Georgia. The evidence did not demonstrate that she could provide D.S. a stable home. In addition, mother's income was based on child support for another child and social security. She testified that she could not afford the move from Georgia to Ohio, which warranted her voluntary placement of her other two boys in foster care. Mother likewise did not satisfy her minimum financial support obligations.

**{¶87}** Further, D.S. did not demonstrate the strong bond with mother that he showed with his father. D.S. was resistant to his mother's affections, which was likely a result of the fact that D.S. had not lived with her since he was two-years-old and the fact that he only had telephone visits with her for more than a year.

**{¶88}** Finally, the GAL recommended permanent placement with the agency for the purpose of pursuing D.S.'s adoption because D.S. needs permanency and neither of his parents could provide the stability that he needs.

{¶89} In light of the foregoing, and upon carefully reviewing the record, the juvenile court's findings are supported by clear and convincing evidence, were not against the manifest weight of the evidence, and were within the trial court's discretion. The evidence establishes that neither parent can provide the stable home that D.S. needs and that permanency could not be achieved without granting the agency's motion. Thus, both mother and father's second assignments of error lack merit and are overruled.

{¶90} As for father's first assigned error, he claims that the trial court committed reversible error in not continuing the custody trial in light of his recent incarceration, inability to participate, and his prior active involvement in the case. We disagree. A trial court has broad discretion regarding procedural issues, which includes its decision to grant or deny a continuance. *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶44; *State v. Jones,* 91 Ohio St.3d 335, 342, 2001-Ohio-57, 744 N.E.2d 1163 (2001).

{¶91} In this case, the trial had already commenced when father was arrested. Further, he was represented by counsel who was present for the duration of the proceedings, and the trial court suggested father appear telephonically.

{¶92} The next day of trial convened and father's counsel indicated that father was picked up on a probation violation. As a result, counsel moved the court to continue the duration of the trial. The trial court denied the motion. Father was still incarcerated two months later on the final day of trial. On this final day of trial, father's counsel moved the court to order the federal facility to transport father to the court to participate in this final day of trial. The trial court denied the motion explaining that the

25

federal facility would not honor this type of state order. The trial court again indicated a willingness to allow father to participate via conference call, but his counsel indicated that the federal facility would not facilitate this request.

{¶93} Notwithstanding, father could have submitted his trial testimony via deposition. *In re H.R.*, 6th Dist. Williams Nos. WM-13-008 and WM-13-009, 2014-Ohio-635, ¶24-25 (holding in part that it was not error in proceeding with termination of parental rights hearing since mother, who did not appear out of fear of being arrested on an unrelated matter, could have submitted her testimony via deposition.)

{¶94} Further, the custody trial had previously been continued to facilitate father's efforts to satisfy his case plan requirements, which were still unsatisfied in May of 2014.

{¶95} Furthermore, father was still incarcerated on February 25, 2015, some nine months after the trial. Nevertheless, the trial court afforded him another opportunity to submit an approved home study to enable D.S. to be reunified with him after his most recent incarceration. Father again failed to comply.

{¶96} Thus, we cannot conclude that the trial court abused its discretion in denying father's motion to continue the custody trial. Father has been provided ample opportunity to establish his ability to provide D.S. with the safe home that D.S. needs, but he failed to do so. Accordingly, his first assignment of error lacks merit.

{¶97} Based on the foregoing, all of appellants' assigned errors lack merit, and the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is affirmed.

26